672 So.2d 436 (1996)
Richard W. CHRISTIAN, et al, Plaintiff-Appellee,
v.
Paul W. FONTENOT, et al, Defendant-Appellant.
No. 28175-CA.
Court of Appeal of Louisiana, Second Circuit.
April 8, 1996.
Rehearing Denied May 2, 1996.
*438 Ben Marshall, Jr., Shreveport, for Appellant.
John M. Madison, Jr., Shreveport, for Appellee.
Before NORRIS and HIGHTOWER, JJ., and CLARK, J. Pro Tem.
CLARK, Judge Pro Tem.
Colonel Paul W. Fontenot and the State of Louisiana (defendants), appeal a jury verdict awarding Sergeant Richard W. Christian and *439 Lieutenant Urbane R. "Rudy" Crain, Jr. (plaintiffs), damages, attorney fees, and court costs for statements and actions attributed to Colonel Fontenot concerning plaintiffs' ownership of stock in River Cities Gaming Corporation (River Cities). The defendant, Colonel Fontenot, was the commander of the state police, and the plaintiffs were both veteran state police officers. After a trial by jury, the trial court found that Colonel Fontenot defamed the plaintiffs, that his actions were negligent, constituted an abuse of rights, violated the plaintiffs' civil rights, and interfered with their business relations. The trial court further found that the defendants failed to prove that they were entitled to discretionary immunity under LSA-R.S. 9:2798.1, or that Colonel Fontenot was entitled to qualified immunity from liability on the plaintiffs' civil rights claim. At the conclusion of the trial, the judge determined that the State of Louisiana was solidarily liable as to each cause of action, excluding the civil rights violations under 42 U.S.C. § 1983. For the following reasons, we reverse.

FACTS
Southwest Gaming Services of Louisiana was formed on February 26, 1992, to take part in the emerging video gaming industry in Louisiana. Southwest Gaming Services of Louisiana is a joint venture partnership comprised of a Louisiana corporation, River Cities Gaming Corporation (51 percent), and a Nevada corporation, Southwest Gaming Services, Inc. (49 percent). Sometime prior to July 19, 1991, the plaintiffs, Christian and Crain, were presented with an opportunity to invest in River Cities by a mutual friend, Richard Pernici.
Plaintiffs were employed in the patrol division of the state police with their primary duties relating to enforcement, control, regulation, and registration of vehicles on Louisiana highways. Prior to making the proposed investment, knowing the state police would have the responsibility of regulating and licensing the fledgling video gaming industry in the state, they obtained a draft of the pending legislation relevant to state police ownership of video poker stock. This legislation prohibited stock ownership by members of the video gaming division of the state police.[1] The plaintiffs also reviewed the State Police Procedural Order Manual. As the legislation assigning the licensing and regulatory responsibilities to the state police had yet to be passed, the procedural rules of the state police did not specifically address the plaintiffs' proposed investment.[2]
Next, they presented the question of trooper ownership in the video gaming industry to the video poker section and the research section of the state police. Trooper Bruce Vanderhoeven and Sergeant Darrell Guillory of the video poker section and Sergeant Donald Cotton of the research section determined there existed no specific prohibition regarding investment in the gaming industry by state police officers other than those officers in the video poker section. *440 Sergeant Cotton informed Crain of his findings and further advised him to contact the legal division of the state police for an opinion on the matter.
Before Crain had an opportunity to contact the legal department, he spoke over the phone with Colonel Marlin Flores who was commander of the state police at the time. Crain testified that Colonel Flores advised him that he did not object to the investment, but requested that he contact the legal section for an opinion. Thereafter, Crain contacted James Dixon, an attorney with the state police. Crain testified Dixon told him he did not know of any legal prohibition to the investment.
However, according to an internal affairs investigation report regarding the investment, Colonel Flores told investigators he informed Crain to put his request in writing and forward it through his chain of command (see footnote two regarding Procedural Order Number 202). James Dixon is reported as having told investigators that Crain had not asked about the legality of the investment, only informing him of how much money was involved. Both Colonel Flores and Dixon stated they would never have given verbal authorization for such an investment.
On July 19, 1991, Crain and Christian each invested $7,000 in River Cities for a five percent share of the corporation. Also in July 1991, the enabling legislation allowing video gaming in Louisiana was passed by the legislature giving the state police regulatory authority over the industry. On April 3, 1992, Trooper Vanderhoeven received the application for licensing from Southwest Gaming Corporation of Louisiana. On the application, both of the plaintiffs were listed as owners in River Cities. Trooper Vanderhoeven attached a memorandum to the application emphasizing the ownership by the state police officers, and forwarded it to his supervisor, Sergeant Guillory. After reviewing the file, he forwarded it to Sergeant Ronald Lewis who reviewed it and approved the license.
On June 4, 1992, the Nevada Gaming Control Board informed Lieutenant Gilbert Blackwelder of the Louisiana State Police, video poker section, that they were delaying licensing of Southwest Gaming Services of Nevada due to the plaintiffs' ownership in River Cities. As Lieutenant Blackwelder was unaware of the troopers involvement, he referred the matter to Sergeant Lewis. According to the internal affairs report, Sergeant Lewis informed him that he was aware of the inquiries made into the legality of the investment by the plaintiffs and had been informed by either Christian or Crain that Colonel Flores had authorized the investment during his administration.
In early 1992, Colonel Paul Fontenot had taken office as the commander of the state police. On June 5, 1992, before entering a New Orleans courtroom to testify on an unrelated matter, he was approached by Captain Ronnie Jones of the public affairs section and informed that a reporter was asking questions about an Associated Press article that stated Louisiana State Police Officers were allowed to own stock in the video gaming industry. Colonel Fontenot testified this was the first he had heard of the plaintiffs' investment. At this point Colonel Fontenot went into the courtroom, and attended a press conference that followed. Approximately one and one-half hours after learning about the investment he was approached by a reporter and made comments reported in the Baton Rouge Morning Advocate the following day.[3] Generally, the statements attributed to Fontenot were that he was surprised to learn of the investment, that the state police did not allow this type of investment, and that the state troopers involved would either have to divest themselves of the video gaming stock or quit the state police.
Upon further investigation, Colonel Fontenot determined that there was no statutory or procedural rule that would specifically prohibit this type of investment. Therefore, he revised Procedural Order Number 202 making it clear that all state police officers were prohibited from owning stock in the video poker industry.
After the publication of the articles and the statements by Colonel Fontenot, the *441 plaintiffs sold their interests in River Cities redeeming the full amount of their initial investment. Though they were never specifically ordered to divest themselves of the stock, they testified they felt they had been given an ultimatum to either sell the stock or quit the state police. As they were both near retirement, they saw no option but to sell the stock. Subsequently, the stock value increased dramatically. After a full internal affairs investigation, clearing the plaintiffs of any wrong-doing, they brought this action.
After a trial on the merits, the jury found that the actions and statements of Colonel Fontenot defamed the plaintiffs, were negligently made, constituted an abuse of rights, interfered with the plaintiffs' business relations, and violated their civil rights. Further, they found that the defendants failed to prove that they were entitled to discretionary immunity or that Colonel Fontenot was entitled to qualified immunity. For defamation the jury awarded each plaintiff $5,000 for humiliation, embarrassment, and mental anguish. Also, the jury awarded $110,000 for the loss of market value in the shares of River Cities. They awarded nothing for loss of reputation. Attorney fees were awarded in the amount of $57,749. Court costs and expert witness fees were awarded in the amount of $2,035.45, plus "all other court costs." At the conclusion of the trial, the trial judge determined that the State of Louisiana was solidarily liable as to all of the causes of action excluding the civil rights claims. Defendants appeal.

DISCUSSION
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Neither ordinary conflicts in testimony, nor the appellate court's mere disagreement with the trial court's conclusions, will constitute sufficient grounds for reversal. Arceneaux v. Domingue, 365 So.2d 1330, 1335 (La.1978).

Defamation:
As their first assignment of error, the defendants argue the trial court erred in finding the plaintiffs proved that the statements of Colonel Fontenot defamed them.
In order to prevail in a defamation action, the plaintiff must prove the following by a preponderance of the evidence: 1) defamatory words, 2) publication, 3) falsity, 4) malice (actual or implied), and 5) a resulting injury. Cangelosi v. Schwegmann Bros. Giant Super Markets, 390 So.2d 196 (La.1980); Hines v. Arkansas Louisiana Gas Co., 613 So.2d 646 (La.App. 2d Cir.), writ denied, 617 So.2d 932 (La.1993); Martin v. Lincoln General Hosp., 588 So.2d 1329 (La.App. 2d Cir. 1991), writ denied, 592 So.2d 1302 (La.1992).
A defamatory communication is one that tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. Restatement (Second) of Torts Sec. 559 cmt. e (1977); Sassone v. Elder, 626 So.2d 345 (La. 1993). In determining whether the statements attributed to Colonel Fontenot were defamatory, the jury was instructed to consider whether a reasonable person could have understood the words in a defamatory sense. The jury was also told to consider the circumstances in which the statements were made, and the reasonable inferences which might be drawn from them. See Bussie v. Lowenthal, 535 So.2d 378 (La.1988); Sassone v. Elder, supra. To these legal principles, the jury was to apply the statements of Colonel Fontenot.

What Fontenot Said:
The entire article is contained in the appendix. However, the statements attributed to Colonel Fontenot comprising the basis of this litigation were as follows:
State Police Chief Paul Fontenot said Friday the two troopers must either give up their share of a video poker service business or quit the state police.
He said he was unpleasantly surprised by reports that the Nevada Gaming Control Board found two Louisiana state policemen among the owners of River Cities Gaming Corp., a joint venture with Southwest Gaming Services.

* * *
*442 Also, in response to comments made by a former Las Vegas police officer that the Louisiana State Police allows its officers to own interests in this industry, Colonel Fontenot is reported to have responded as follows:
Fontenot said that's not true.
"We're surprised it happened. It shouldn't have," Fontenot said Friday. "It will be addressed and they will either have to separate themselves from that business or the state police."
Fontenot said policy for officers seeking to moonlight is for a request to be made in writing and for the request to be reviewed by a panel.

* * *
It was conceded at trial that virtually every newspaper in the state carried similar stories. These are the totality of the statements made by Colonel Fontenot upon which the plaintiffs' claim of defamation is based.
It is difficult to see how any of Colonel Fontenot's statements tended to expose the plaintiffs to "contempt, hatred, ridicule or obloquy." Brown v. News-World Publishing Corporation, 245 So.2d 430 (La.App. 2d Cir. 1971); Autry v. Woodall, 493 So.2d 716 (La. App. 2d Cir.1986). Indeed, it was not the statements by Colonel Fontenot that tended to harm the plaintiffs, but the public perception of state police officers investing in an industry they were responsible for licensing and regulating. While we find that none of these statements were defamatory on their face, we determine the trial court, in its discretion, could have reasonably found that the comments attributed to Colonel Fontenot, when read as a whole and under these circumstances, implied that the plaintiffs had done something against the policy of the state police, which they had not. But that does not equate to defamation.
In view of the procedural rules that were in place at the time regarding secondary employment (moonlighting) and conduct unbecoming an officer, we assume, but do not decide, that the plaintiffs met their burden of proving that the statements were false, or better stated, incorrect. However, we conclude that, even if the published statements were false and defamatory, the plaintiffs failed to prove that Colonel Fontenot made the statements with actual or implied malice.
To show malice, plaintiff must prove that the statements were known to be false or were made with reckless disregard for whether the statements were true or false. Hebert v. Louisiana Association of Rehabilitation Professionals, Inc., 95-1104 (La. 6/30/95), 657 So.2d 998.
The plaintiffs argued at trial that Colonel Fontenot had ample time to investigate and determine whether the law or procedures of the state police prohibited this kind of an investment before he made these comments. Colonel Fontenot, as commander of the state police, had at his disposal all of the resources to investigate the issue, and plaintiffs contended he acted recklessly when he commented before doing so. Plaintiffs further implied that Colonel Fontenot's objective was to shield the state police's failure to implement an appropriate policy by using the plaintiffs as scape-goats. However, this is not supported by the record.
Colonel Fontenot testified at trial that it was not his intention to imply that the plaintiffs had done anything wrong, but to express to the reporter, and ultimately to the people of the State of Louisiana, what he believed the policy of the state police was with regard to investments in the video gaming industry. His intent was to maintain the citizens' faith in the credibility of the state police. As was reported in the newspaper article, concurrent with his declaration that the policies of the state police prohibited this investment, he stated its policy with respect to moonlighting jobs. It seems obvious he believed this rule, Procedural Order Number 202, would have applied to this situation. When he later learned that there did not exist a procedural rule that specifically prevented this type of investment, he promptly revised Procedural Order Number 202 to prohibit all investments in industries the state police regulated. In short, there is simply no evidence that he made the statements with actual malice towards these officers, or with the knowledge that the statements were false.
*443 Neither does the record support the contention that Colonel Fontenot made the statements with a reckless disregard for whether they were true or false. The plaintiffs argued at trial that Colonel Fontenot could have verified his comments regarding state police policy before he spoke to the reporter, or that he could have refused to comment on the subject until he had an opportunity to determine the policy, and by failing to do so he acted recklessly.
In order to analyze the statements to determine if they were made with a reckless disregard for the truth, it is important to consider the circumstances under which they were made. Colonel Fontenot first became aware of the plaintiffs' investment on June 5, 1992, while in the federal courthouse in New Orleans attending a hearing regarding ownership of the gun used in the assassination of Huey P. Long. He was in the hearing for approximately 15-20 minutes. A press conference regarding that matter followed. Thereafter, approximately one and one-half hours after first learning of the plaintiffs' investment, he was approached by a reporter regarding this subject. At this time he made statements which he believed expressed the policy of the state police regarding its officers' ownership of video gaming stock. It appears he was incorrect.
The record shows he did not, in fact, have time to investigate the issue before speaking with the reporter. He also testified that he felt the public's perception of his refusing to answer the questions would have seemed evasive. It is ultimately Colonel Fontenot's responsibility, as the Deputy Director of the Department of Public Safety and the Supervisor of the State Police, to maintain the integrity the public has in the state police. Colonel Fontenot testified that the ownership by state police officers of stock in an industry they were responsible to regulate, particularly an industry as controversial as video poker, went right to the heart of the integrity of the state police. With this in mind, he responded to the best of his ability. We conclude that the trial court was clearly wrong in its determination that Colonel Fontenot made the statements with either actual or implied malice.
Discretionary Function Immunity:
The defendants also assign as error the trial court's determination that the defendants failed to prove they were entitled to discretionary function immunity as provided by LSA-R.S. 9:2798.1. The statute provides as follows:
Section 2798.1. Policy-making or discretionary acts or omissions of public entities or their officers or employees
(A) As used in this section, "public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, offices, officials, and employees of such political subdivisions.
(B) Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
(C) The provisions of Subsection (B) of this section are not applicable:
(1) To acts and omissions which are not reasonably related to the legitimate governmental objective for which the policy-making or discretionary power exists; or
(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
(D) The legislature finds and states that the purpose of this Section is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the Constitution of Louisiana.
Immunity from liability for discretionary acts is essentially the same as the immunity conferred on the federal government by the exception in the Federal Tort Claims Act (FTCA). Chaney v. National *444 R.R. Passenger Corp., 583 So.2d 926 (La. App. 1st Cir.1991). In Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), the United States Supreme Court developed the following two-step analysis to examine immunity under FTCA: (1) whether a statute, regulation, or policy specifically proscribes a course of action; (2) whether the challenged action is grounded in political, economic or social policy. The Louisiana Supreme Court has adopted the Berkovitz inquiry to analyze the applicability of LSA-R.S. 9:2798.1. Fowler v. Roberts, 556 So.2d 1, 15 (La.1989).
The application of this two-pronged inquiry was explained in Fowler as follows:
Discretion exists only when a policy judgment has been made. Judicial interference in executive actions involving public policy is restrained by the exception. Thus, the exception protects the government from liability only at the policy making or ministerial level, not at the operational level.
Id. at 15.
At issue in the present case are the statements of Colonel Fontenot regarding the policy and procedures of the state police as well as his actions in requiring, expressly or otherwise, the plaintiffs to sell their interests in River Cities or lose their jobs.
The trial court stated that a reasonable commander of the state police would have conducted at least some investigation into the facts and law before speaking to the press and was therefore negligent. We are unaware of any tort for negligently speaking. Further, as the discretionary immunity function applies, the defendants are shielded from negligence liability.
As quoted above, LSA-R.S. 33:4862.16 specifically prohibits members of the video gaming division of the state police from owning an interest in video poker stock. In their brief, the plaintiffs argue that since LSA-R.S. 33:4862.16, after being drafted by the legislature with the help of the state police, clearly specified which troopers were prohibited from investing in the video gaming industry, and since the plaintiffs were not among those proscribed, Colonel Fontenot was left with no discretion to proscribe their actions. We disagree.
The legislature's prohibition placed upon officers in the video gaming division did not impede the commander of the state police from enacting stricter procedures with regard to the rest of the officers under his command. There exists no specific mandate within this statute, or elsewhere, prohibiting the commander of the state police from enacting procedural rules at his discretion to affect the officers under his command. In fact, Sergeant Cotton of the research section testified that it was well within the purview and prerogative of the commander of the state police to promulgate procedural rules. Thus, the first part of the Berkovitz test is met.
Since there is no statute, regulation, or policy specifically prohibiting Colonel Fontenot's course of action, we turn to the second part of the test: whether the challenged action was grounded in political, economic, or social policy. We determine that it was.
Colonel Fontenot testified that it was his belief that to allow officers to invest in an industry they had the responsibility to regulate would harm the integrity of the state police, ultimately eroding public confidence. He stated he made the comments regarding state police ownership in video gaming stock to the best of his ability in an attempt to maintain the credibility of the public in the state police. When he discovered this type of an investment was not specifically prohibited, he promulgated rules to prevent such investments. We find that the challenged actions were done to achieve a legitimate public end. The trial court was clearly wrong in its determination that the defendants failed to prove they were entitled to discretionary immunity under LSA-R.S. 9:2798.1.

Abuse of Right:
The defendants argue that the trial court was clearly wrong in its determination that the plaintiffs proved the actions of Colonel Fontenot were an abuse of rights.
In order to establish a cause of action for abuse of rights, the jury was instructed that *445 the plaintiffs must prove by a preponderance of the evidence that: 1) the right was exercised solely to harm the plaintiff, or with the predominate motive of harming the plaintiff; 2) there was no serious or legitimate interest worthy of judicial protection to be gained by the exercise of the right; 3) the right was exercised in violation of moral rules of elementary fairness or was exercised in bad faith; and, 4) the defendant exercised the right for a purpose different than that purpose for which the right was granted. Illinois Central Gulf Railroad Company v. International Harvester Company, 368 So.2d 1009 (La.1979); Morse v. J. Ray McDermott & Co., Inc., 344 So.2d 1353 (La.1977).
There exists no evidence in the record that Colonel Fontenot, by enacting policies that would have required the plaintiffs to separate themselves from their investment or the state police, did so with the sole intent or predominate motive of harming the plaintiffs. He testified he did so to protect the integrity of the state police, a legitimate interest.
When Colonel Fontenot discovered the internal policies did not specifically prohibit all state police officers from investing in the gaming industry, he immediately amended Procedural Order Number 202. In doing so he prohibited not only the plaintiffs' specific gaming investment, but investments by all members of the state police in anything that they had the authority and responsibility to regulate.
We conclude that the trial court was clearly wrong in its determination that the plaintiffs had proven the actions of Colonel Fontenot constituted an abuse of rights.

Invasion of Business Interests:
The defendants also argue the trial court was clearly wrong in its determination that the plaintiffs proved the actions of Colonel Fontenot constituted an invasion of business interests.
In order to recover for invasion of business interest, the plaintiff must show that the defendant improperly and maliciously influenced others not to deal with him. Muslow v. A.G. Edwards & Sons, Inc., 509 So.2d 1012 (La.App. 2d Cir.), writ denied, 512 So.2d 1183 (La.1987).
The plaintiffs argued at trial that there was nothing in the statutes or procedural rules to prohibit the investment, and that when Colonel Fontenot presented them with the ultimatum to divest themselves of their stock or lose their jobs, he interfered with their business relations. However, the record contains no evidence that Colonel Fontenot did anything improperly or maliciously. His actions and statements were done with the intention of protecting the integrity of the state police. There exists no evidence of any other motive. The trial court was clearly wrong when it determined that the plaintiffs proved Colonel Fontenot's conduct constituted an invasion of the plaintiffs' business interest.

Civil Rights:
Plaintiffs asserted at trial, and the trial court found, that the actions of Colonel Fontenot in ordering them, either expressly or implicitly, to divest themselves of their River Cities stock or lose their job as state police officers violated their civil rights. On appeal, the defendant, Colonel Fontenot, argues that the trial court was clearly wrong in its determination that his conduct violated the plaintiffs' civil rights, and, alternatively, that qualified immunity shielded him from liability for these acts. We determine that Colonel Fontenot was entitled to qualified immunity.
Government officials performing discretionary functions have qualified immunity shielding them from civil damage liability as long as their actions could reasonably have been thought to have been consistent with rights they are alleged to have violated. Whether an official protected by qualified immunity may be held personally liable for allegedly unlawful official actions generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time the action was taken. Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).
To avoid the protection of qualified immunity on the basis that the right which *446 the official allegedly violated is "clearly established," the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right; the right must be apparent in light of pre-existing law. Hare v. City of Corinth, Mississippi, 22 F.3d 612 (5th Cir. 1994); Anderson, supra.
In Moresi v. Department of Wildlife and Fisheries, 567 So.2d 1081 (La.1990), the Louisiana Supreme Court, interpreting Harlow, developed its own two-part test. First, the court must determine whether the law was clearly established at the time the action occurred. Second, if the law is clearly established, the defendant must show that, because of extraordinary circumstances, he neither knew or should have known of the relevant standards.
The plaintiffs argued at trial that Colonel Fontenot, by giving them the ultimatum of either selling their stock or quitting the state police, violated their civil rights. First, they claim this constituted a taking without just compensation; second, that this violated their rights of freedom of association. The jury was instructed that, in determining whether qualified immunity applied, to first "look to the currently applicable law and determine whether the law was clearly established at the time the action in question occurred." However, the only currently applicable law the jury was informed of, was the broad, abstract language in the constitution regarding takings and freedom of association.
In Anderson, the United States Supreme Court stated:
The operation of this standard ... depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how clear it may be that the particular action is a violation) violates a clearly established right ... But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow. Plaintiffs would be able to convert the rule of qualified immunity that our cases clearly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.
483 U.S. at 639, 107 S.Ct. at 3038-39.
Therefore, the specific issue the trial court should have decided for the first part of the test established in Moresi, was whether there is a clearly established constitutional right of government employees to the unrestricted ownership of interests in an industry their governmental employer has the legislatively assigned responsibility to license and regulate.
At no point in the adjudication of this case have the plaintiffs, either in their original petition, their requested jury instructions, or their brief on appeal, cited any authority that indicates or suggests that Colonel Fontenot violated a clearly established constitutional right of the plaintiffs. In order for the first part of the Moresi test to have any effect, the law the defendants are alleged to have violated must be examined in specific, not general terms. We determine that the actions of Colonel Fontenot did not violate any clearly established constitutional right.
The trial court was clearly wrong in determining that qualified immunity did not shield the discretionary acts of Colonel Fontenot from liability for alleged constitutional violations.

CONCLUSION
An analysis of the jury's verdict and the trial court's decision weighed against the evidence presented, can only lead to the reasonable conclusion that it was the apparent actions of the plaintiffs to obtain advance approval to purchase the stock that prompted the verdict and decision in their favor. While this can be explained as the result of compassion and sympathy, it cannot survive as an application of appropriate legal principles. It was clear error.
For the above reasons we reverse the trial court. The trial court was clearly wrong in its determination that the plaintiffs proved that the statements and actions of the defendant, *447 Colonel Fontenot, defamed them, constituted an abuse of rights, or was an invasion of their business interests. Further, we find that the defendants proved their entitlement to discretionary function immunity under LSA-R.S. 9:2798.1. Also, to the extent the actions and statements of Colonel Fontenot violated the plaintiffs' civil rights, we find the conduct is protected by qualified immunity.
The award of attorney fees and costs are also reversed. The costs of this appeal are assessed to the plaintiffs.
REVERSED.
MORRIS, J., concurs in the result only.

APPLICATION FOR REHEARING
Before MARVIN, SEXTON, NORRIS AND HIGHTOWER, JJ., and CLARK, J. Pro Tem.
Rehearing denied.

APPENDIX

Baton Rouge Morning Advocate 6-6-92

LOUISIANA

SATURDAY

Troopers must give up shares in video poker business or quit

By The Associated Press
NEW ORLEANSState Police Chief Paul Fontenot said Friday that two troopers must either give up their share of a video poker service business or quit the Louisiana State Police.
He said he was unpleasantly surprised by reports that the Nevada Gaming Control Board found two Louisiana state policemen among the owners of River City Gaming Corp., a joint venture with Southwest Gaming Services.
Southwest is a slot machine route service company, and River City Gaming Corp. has been organized to get part of the new video poker business in Louisiana.
Also listed among the owners of River City Gaming is Louisiana Racing Commission member Bobbie Rose Wharton of Bossier City.
The board listed Cassandra Piper as a part owner and identified her as the wife of a Louisiana legislator. But there are no Louisiana legislators named Piper, and her name does not appear in a listing of spouses of legislators.
Nevada Gaming Control Board member Steve DuCharme identified the state police officers as Lt. Urbane Crane and Sgt. Richard Christian. "There is a potential for misuse," said DuCharme, a former Las Vegas police officer.
DuCharme said the Louisiana State Police, which will regulate gaming, allows its officers to have interests in gambling ventures.
Fontenot said that's not true.
"We're surprised it happened. It shouldn't have," Fontenot said Friday. "It will be addressed, and they will either have to separate themselves from that business or the state police."
Fontenot said policy for officers seeking to moonlight is for a request to be made in writing and for the request to be reviewed by a panel.
"Our new policy prohibits having any financial interest in anything we regulate, whether it's a trucking firm or gaming," said Capt. Ronnie Jones, state police public information officer.
Due to concerns about the ownership of River City, the Game Control Board decided Wednesday to delay action on the application of Southwest to start video poker operations in Louisiana.
David Johnson, attorney for Southwest Gaming, said the two officers were outstanding members of the state police, and the law doesn't prohibit them from investing in gaming.
But DuCharme said the officers could exert pressure to stop investigations even if they weren't directly involved in gaming regulation. "I'm not saying they would do this, but there is the potential," he added.
*448 Board Chairman Bill Bible said Nevada casinos would love to see their shareholders on the board or the staff that regulates the industry.
NOTES
[1] LSA-R.S. 33:4862.16 states as follows (in pertinent part):

(A) ... no person employed by or performing any function on behalf of the division may:
(1) Be an officer, director, owner, or employee of any person or entity licensed by the division ...
LSA-R.S. 4862.1(B)(3) defines "division" as:
... the video gaming division of the gaming enforcement section of the office of the state police within the Department of Public Safety and Corrections.
[2] There did, however, exist two arguably analogous provisions:

Procedural Order Number 202 outlines the procedure for obtaining permission for secondary employment. The procedure includes submitting a written application through the chain of command. Prior to approval, the application is to be reviewed by the Research and Planning Section of the state police.
Procedural Order Number 201, Code Of Conduct And Ethics, states:
(2) Conduct Unbecoming an Officer
a. Officers shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Department. He/She shall not conduct himself/herself in a manner which is unbecoming to a police officer.
b. Unbecoming conduct is that conduct which:
(1) Brings the Department or any of its subdivisions into disrepute; or, ...
* * * * * *
(5) That which may reasonably be expected to destroy public respect for State Police officers and/or confidence in the Office of the State Police.
[3] This article is contained in its entirety in the appendix.