I t CARAWAY, J.
This action stems from the repeated sexual abuse of a five-year-old by an unknown assailant. The child’s father, who was first charged with the crime and then cleared, brings this action individually and on behalf of the minor child against several defendants, including officials in the state office of social services and the attorney for his former wife, the child’s mother. Because of the continued sexual abuse of the child which occurred during the time of the mother’s custody and the continued criminal prosecution of the father, the plaintiffs assert various claims for constitutional rights violations, intentional infliction of emotional distress and malicious prosecution. Following summary judgment proceedings and a ruling on an exception of no cause of action, these claims were dismissed by the trial court, and we now affirm the trial court’s rulings.

Facts and Procedural History

Joseph Miles Arledge (“Arledge”) brings this action individually and on behalf of his minor child, J.A., (together, the “Plaintiffs”). Underlying this action are three other proceedings involving Arledge and the sexual abuse and custody of J.A. The first action stemmed from the divorce of Arledge and his wife, Janet Mize (“Mize”), and concerned their custody battle over J.A. (hereinafter the “Custody Proceeding”). In early May 1994 in the course of the Custody Proceeding, Arledge voiced suspicions of possible sexual abuse of J.A. Mize took J.A. to Dr. Meade O’Boyle for a sexual abuse evaluation on May 16, 1994. On the same day, J.A. was interviewed by Deborah Sherrill (“Sherrill”), a defendant in this action who is an employee of the Office of Community Services (“OCS”) in Ouachita Parish, an office of the Louisiana Department of Social Services. Though the record is somewhat sketchy, this involvement of Sherrill marked the beginning of a secondary proceeding by which the OCS began exercising its | gpowers pursuant to the Louisiana Children’s Code (hereinafter the “OCS Proceeding”). A third proceeding arose with the arrest of Arledge on May 24, 1994 for aggravated rape of J.A. after Dr. O’Boyle’s examination confirmed that J.A. had been sexually abused (hereinafter the “Criminal Proceeding”).
The foregoing proceedings continued in varying phases of litigation or investigation into 1995. In January, E. Rudolph McIntyre, Jr. (“McIntyre”), a defendant and appellee herein, enrolled as Mize’s attorney in the Custody Proceeding. Though J.A. remained in Mize’s custody following Arledge’s arrest and release on bail, the Custody Proceeding (which suit record is *1218 not in evidence before us) apparently remained pending.
On March 6, 1995, Mize took J.A. to Dr. O’Boyle for a second examination. Dr. O’Boyle prepared the following report of the examination:
[J.A.] is a 5 year old white female child who is in kindergarten. She comes in for re-evaluation of sexual abuse. Essentially, [J.A.] has been living with her mother, Janet Hendricks, for about the last 7-8 months. [J.A.] indicates that when she was visiting her father, Miles (Arledge), he would take her in his bedroom, and he would put his wiener in her front and her back part, and she points to her vagina and her anus.
Physical exam continues to show that her hymenal ring is not intact and that her anus gapes open. The hymenal ring opening is not that large, but her anus opening is about 2 cm., and one can easily see 4-5” in to the anus, this is a very significant opening. I’ll have to compare the photographs to my previous photographs, but I don’t see any improvement in her anal area.
Copies of Dr. O’Boyle’s report were sent at that time to the OCS and to McIntyre, and Plaintiffs allege that the report was then “concealed and withheld” from Ar-ledge by the OCS and McIntyre. Plaintiffs also allege that the expense of the March 6 examination was billed to the district attorney as a cost in the Criminal Proceeding.
On December 28, 1995, Sherrill submitted to a deposition in the Custody Proceeding and was ordered to produce the complete records of the OCS relative |3to its investigation. During the deposition, it was revealed to Arledge that Dr. O’Boyle had examined J.A. a second time on March 6, 1995. Dr. O’Boyle’s second report was given to Arledge’s counsel on December 29, 1995 and the report, together with Dr. O’Boyle’s testimony after she compared photographs taken during the two examinations, revealed that J.A. had continued to be sexually abused between May 16, 1994 and March 6, 1995. During this period of time, J.A. was in Mize’s exclusive custody and Arledge had no unsupervised contact with J.A.
On January 2, 1996, on the basis of Dr. O’Boyle’s second report and her testimony, the charges against Arledge were nolle prossed prior to trial and J.A. was removed from Mize’s custody and placed into protective custody with the OCS. At that time, the OCS Proceeding was transferred from the Ouachita Parish office to Franklin Parish, the parish in which J.A. was then domiciled. In the Franklin Parish OCS office, the defendants, Terri Spence, Karen Hendry, and Charles Williamson (together, the “Franklin Parish Defendants”) became involved in the OCS management of the case. Although the continued sexual abuse of J.A. was ordered to be investigated, the Franklin Parish OCS allowed J.A. to be returned to the home of Mize and her husband, Ronald Hendricks, on February 14, 1996 without ascertaining the identity of the perpetrator.
A further hearing in the Custody Proceeding was held in March 1996. The court issued a temporary order granting Arledge custody and specifying that J.A. have no contact with Mize. Following the return of custody of J.A. to Arledge, Ar-ledge allegedly discovered that J.A. had been sexually abused again between February 14, 1996 and March 1996 when Ar-ledge obtained custody. This last period of abuse serves as the basis for Plaintiffs’ claims against the Franklin Parish Defendants.
|4In response to the actions of the defendants, the trial court granted a motion for partial summary judgment on behalf of the Franklin Parish Defendants and also maintained a partial exception of no cause of action and granted a motion for partial summary judgment on behalf of McIntyre. The Plaintiffs filed devolutive appeals from these rulings which were consolidated by this court.

*1219
Discussion

Franklin Parish Defendants — § 1988 Claim
The motion for partial summary judgment granted by the trial court dismissed the Plaintiffs’ claims against the Franklin Parish Defendants for deprivation of constitutional civil rights under 42 U.S.C.1983, 1985, 1986 and 1988.[1] A motion for summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). Summary judgment procedure is favored and must be construed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by La. C.C.P. art. 969. La. C.C.P. art. 966(A)(2).
Title 42, § 1983 of the United States Code provides, in pertinent part, as follows:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....
| BRecovery under § 1983 requires a plaintiff to allege and prove two essential elements: (1) that the defendant’s conduct occurred under color of state law, and (2) that the defendant’s conduct deprived plaintiff of a right, privilege or immunity secured by the Constitution or a law of the United States. Moresi v. State, Department of Wildlife and Fisheries, 567 So.2d 1081 (La.1990). In other words, 42 U.S.C. § 1983 imposes liability for violation of rights protected by the United States Constitution, not for violations of duties of care arising out of state tort law. Baker v. McCollan, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); Ross v. Sheriff of Lafourche Parish, 479 So.2d 506, 512 (La.App. 1st Cir.1985).
However, when an official performs a function integral to the judicial process or a traditional legislative function, the official is absolutely immune from § 1983 liability for acts performed in those capacities. Moresi, supra, at 1084. Additionally, a qualified immunity generally applies to most acts of government officials.[2] Id. In Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the United States Supreme Court articulated a new objective standard with regard to the qualified immunity defense stating that government officials performing discretionary functions generally are shielded from liability for civil damages under § 1983, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. See Christian v. Fon *1220 tenot, 28,175 (La.App.2d Cir.4/8/96), 672 So.2d 436, writ denied, 96-1385 (La.9/13/96), 679 So.2d 105.
|fiIn Anderson v. Creighton, 483 U.S. 635, 638-640, 107 S.Ct. 3034, 3038-3039, 97 L.Ed.2d 523 (1987), the United States Supreme Court explained the concept of qualified immunity:
When governmental officials abuse their offices, “action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees.” Harlow v. Fitzgerald, 457 U.S. at 814, 102 S.Ct. at 2736. On the other hand, permitting damage suits against governmental officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. Ibid. Orn-eases have accommodated these conflicting concerns by generally providing governmental officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. See, e.g., Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (qualified immunity protects “all but the plainly incompetent or those who knowingly violate the law”) id., [475 U.S.] at 344-345, 106 S.Ct. at 1097-1098 (police officers applying for warrants are immune if a reasonable officer could have believed that there was probable cause to support the application); Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985) (officials are immune unless “the law clearly proscribed the actions” they took); Davis v. Scherer, 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984); id., [468 U.S.] at 198, 104 S.Ct. at 3021 (BRENNAN, J., concurring in part and dissenting and part); Harlow v. Fitzgerald, supra, 457 U.S. at 819, 102 S.Ct. at 2738, 73 L.Ed.2d 396,. Cf, e.g., Procunier v. Navarette, 434 U.S. 555, 562, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978). Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the “objective legal reasonableness” of the action. Harlow, 457 U.S. at 819, 102 S.Ct. at 2739, assessed in the light of the legal rules that were “clearly established” at the time it was taken, id., [457 U.S.] at 818, 102 S.Ct. at 2738.
[[Image here]]
It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must be “clearly established” in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful, see Mitchell, supra, 472 U.S. at 535, n. 12, 105 S.Ct. at 2820, n. 12; but it is to say that in the light of pre-existing law the unlawfulness must be apparent. See, e.g., Malley, supra, 475 U.S. at 344-345, 106 S.Ct. at 1097-1098; Mitchell, supra, 472 U.S. at 528, 105 S.Ct. at 2816; Davis, supra, 468 U.S. at 191, 195, 104 S.Ct. at 3017, 3019.
| “As in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated.” County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998). It is only then that a court should address the issue of qualified immunity. Id.
The Plaintiffs contend that the constitutional right violated in the instant case is J.A.’s right to bodily integrity, citing Doe v. Taylor Independent School District, 15 F.3d 443 (5 th Cir.1994). Additionally, the Plaintiffs insist that the OCS assumed the responsibility for J.A. and that *1221 a “special relationship” was thereby created which is analogous to the state’s relationship with prisoners or mental patients. Out of that “special relationship,” the Franklin Parish Defendants as state officials had an affirmative duty to protect J.A., thereby creating a constitutional right to care and safety. Plaintiffs cite Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) and Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), cases involving institutional custodians.
In Taylor Independent School District, supra, the court first determined that a student who suffered sexual abuse by a public school teacher had been deprived under color of state law of the liberty interest in her bodily integrity protected by the Due Process Clause of the Fourteenth Amendment. The court then found that supervisory liability on the part of the principal of the school could be determined under 42 U.S.C.1983 because of his deliberate indifference in failing to take action that was necessary to prevent the 'abusive action of the teacher and thus protect the constitutional right of the child.
The facts of Taylor Independent School District can clearly be distinguished from the present situation. The violation of J.A.’s right to bodily integrity was a criminal act by an unknown perpetrator — a private actor, not a state actor. The Franklin Parish Defendants had no supervisory role over the unknown perpetrator, [¡¡and their release of the care and custody of a child to her mother cannot be characterized as deliberate indifference to a known risk which the mother would allow the child to suffer. The United States Supreme Court has stated in a similar context that “a [sjtate’s failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.” DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 197, 109 S.Ct. 998, 1004, 103 L.Ed.2d 249 (1989) (dismissing a § 1983 claim in a case involving the release of a child by social services officials back to a home where further physical abuse by the father occurred).
Likewise, the OCS’s role in the OCS Proceeding and pursuant to the Louisiana Children’s Code does not compare to the role of an institutional custodian. The state’s restraint imposed upon a prisoner or mental patient is more of a permanent and total restraint whereas its custody of a child in need of care is only temporary with the aim of making a permanent placement back with a parental figure, either the natural parent(s) or adoptive parents. La. Ch.C. arts. 603(15) and 701. Upon the removal of the child into foster care, the Children’s Code charges the Department of Social Services (OCS) to make every reasonable effort to reunite the child with his parents unless cause for the forfeiture of parental rights exists. La. Ch.C. art. 1015. There was therefore no special relationship of custody in this case that would charge the Franklin Parish Defendants to restrain 'J.A. to the deprivation of Mize’s parental right.
Given this setting where the Franklin Parish Defendants were charged with performing discretionary functions for the assessment of competing interests, it has not been demonstrated that their conduct violated a clearly established constitutional right so as to defeat their qualified immunity from § 1983 liability, nor was there a “special relationship” between the OCS and J.A. which would 19impose an affirmative constitutional duty to provide adequate protection. DeShaney, supra. Accordingly, we affirm the trial court’s granting of summary judgment dismissing the Plaintiffs’ § 1983 claims.
McIntyre — Malicious Prosecution Claim
The trial court granted McIntyre’s peremptory exception of no cause of action as to Arledge’s claim for malicious prosecution. In deciding whether a petition states a cause of action, a court must accept the facts alleged in the petition without reference to any extraneous supporting or controverting evidence. La. C.C.P. art 931; Robinson v. North American Royalties, *1222 Inc., 470 So.2d 112 (La.1985). The court must accept well pleaded allegations of fact as true, and the issue at the trial of the exception is whether, on the face of the petition, the plaintiff is legally entitled to the relief sought. Everything on Wheels Subaru, Inc. v. Subaru South, 616 So.2d 1234 (La.1993); Kuebler v. Martin, 578 So.2d 113 (La.1991). However, under the system of fact pleading retained by Louisiana, the mere conclusion of the pleader unsupported by facts does not set forth a cause or right of action. La. C.C.P. art. 854, official revision comment (a); Latham v. Latham, 216 La. 791, 44 So.2d 870 (1950); In re Phoenix Building & Homestead Association, 203 La. 565, 14 So.2d 447 (1943).
The elements necessary to support a claim for malicious prosecution are: (1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage conforming to legal standards resulting to plaintiff. Hibernia Nat’l Bank v. Bolleter, 390 So.2d 842 (La.1980); Goodman v. Spillers, 28,933 (La.App.2d Cir.12/23/96), 686 So.2d 160, writs denied, 97-0225, 97-0423 (La.3/27/97), 692 So.2d 393. Never favored in our law, a malicious prosecution action must clearly establish that the forms of justice have been perverted to the gratification of private malice and the willful oppression of the innocent. Johnson v. Pearce, 313 So.2d 812 (La.1975).
McIntyre’s representation of Mize in the Custody Proceeding did not begin until January 1995, after the time of Ar-ledge’s arrest and initial incarceration. Arledge contends that the trial court failed to credit McIntyre’s failure to disclose Dr. O’Boyle’s March 1995 examination of J.A. as “the legal causation” for the continuation of the Criminal Proceeding against him. We believe that the trial court’s ruling was correct because McIntyre’s alleged inaction in dealing with the March 6 report could not amount to the legal causation of the continued prosecution of Ar-ledge.
McIntyre simply had in his possession a two paragraph report from Dr. O’Boyle, the meaning and significance of which were less than clear. The fact that the report was later determined to be exculpatory, only when considered in conjunction with Dr. O’Boyle’s subsequent actions and testimony in December 1995, does not render every holder of that report since March 1995 liable for malicious prosecution. Only the district attorney had the discretion to terminate the prosecution, and McIntyre’s alleged failure for whatever reason to voluntarily[3] disclose Dr. O’Boyle’s report to Arledge or the district attorney cannot be compared to a complainant’s actions which spurs the prosecution in a criminal proceeding. See, Touchton v. Kroger Co., 512 So.2d 520 (La.App. 3d Cir.1987). Moreover, Arledge’s petition alleges that the district attorney was on notice inlnApril 1995 of the second examination by virtue of the payment of the costs of the examination as an expense of the Criminal Proceeding.
Because Arledge’s petition fails to make allegations sufficient to show that the Criminal Proceeding continued as a result of McIntyre’s inaction, his claim for malicious prosecution was properly dismissed by the trial court.
McIntyre — Intentional Infliction of Emotional Distress
The Plaintiffs argue that the trial court erred in granting McIntyre’s motion for *1223 partial summary judgment on their remaining claim of intentional infliction of emotional distress. This emotional distress suffered by both J.A. and Arledge resulted from the continuation of the prosecution against Arledge and the continued child abuse of J.A. after the time of Dr. O’Boyle’s March 6 examination.
In support of his motion for summary judgment, McIntyre submitted his own affidavit and an affidavit from Dr. O’Boyle. McIntyre’s affidavit emphasized that despite his receipt of the March 6 re-evaluation report on J.A., the report did not state a conclusion that there was continuing sexual abuse and he drew no such conclusion. Dr. O’Boyle never reported suspicions of ongoing abuse to him. McIntyre knew that Dr. O’Boyle was a licensed, physician and that J.A. was under the care and treatment of Dr. Stephenson and Dr. Gothard, both psychologists, and that all three of these individuals were experienced in juvenile sexual abuse and were mandatory reporters under the Louisiana Children’s Code. Furthermore, McIntyre asserted that at ho time between January 1995 when his representation of Mize began and January 2, 1996 did he know or have reasonable cause to report that J.A. was being subjected to abuse.
Dr. O’Boyle’s affidavit stated that she did not suggest or schedule J.A.’s visit on March 6, 1995 for a re-examination. Dr. O’Boyle maintained that during |1gthe examination, j.A. did not tell her and she did not form any then-present impression that J.A. was being subjected to ongoing sexual abuse. Dr. O’Boyle sent copies of the report to McIntyre and to the OCS.' Dr. O’Boyle asserted that if she had formed an impression of continuing abuse, she would have reported it to the appropriate authorities. Dr. O’Boyle stated that it was only in December 1995 in preparation for Ar-ledge’s criminal trial that she formed the opinion that J.A. had been subjected to sexual abuse after May 1994 and she reported this to the assistant district attorney, not to McIntyre.
Plaintiffs’ claim as alleged in their petition states that because McIntyre had Dr. O’Boyle’s March 6 report, he ■ knew or should have known that J.A. was suffering ongoing sexual abuse which he could have prevented. In opposition to McIntyre’s motion for summary judgment, the Plaintiffs presented various exhibits, the most important being Dr. O’Boyle’s March 6, 1995 report. Also submitted were three rules of professional conduct from which Plaintiffs assert a legal duty owed by McIntyre to Arledge or J.A.[4] In an attempt to show the information available to McIntyre in assessing the content of the March 1995 report, Plaintiffs also presented Dr. O’Boyle’s report from her first examination of J.A. on May 16, 1994, the psychological evaluations of Arledge, Mize and J.A., and the transcript from a July 28, 1995 hearing in the Custody Proceeding where one of J.A.’s therapists testified that it was possible that sexual abuse was continuing.[5]
The essential elements of a claim for intentional infliction of emotional distress are (1) that the conduct of the defendant was extreme and outrageous, (2) |13that the emotional distress suffered by the plaintiff was severe, and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. White v. Monsanto Co., 585 So.2d 1205 (La.1991). Conduct is considered extreme and outrageous when it goes “beyond all possible bounds of decency” and is “regarded as atrocious and utterly intolerable in a civilized community.” Id. at 1209; see also Smith v. Ouachita Parish School Bd., 29,873 (La.App.2d Cir.9/24/97), 702 So.2d *1224 727, writ denied, 97-2721 (La.1/16/98), 706 So.2d 978.
The alleged tortious conduct of McIntyre centers upon his receipt and knowledge of the March 6 report of J.A.’s examination. Underlying their claim for intentional infliction of emotional distress, Plaintiffs attempt to somehow link or equate the “extreme and outrageous” criminal conduct of the unknown child abuser to McIntyre’s action or inaction in dealing .with the March 6 report. That is not the test for the claim. McIntyre’s conduct must be recognized as extreme and outrageous in and of itself, which it obviously was not.
In the face of McIntyre’s evidence that neither he nor Dr. O’Boyle recognized the possibility of continuing sexual abuse in March 1995, Plaintiffs’ claims rest upon the written report of J.A.’s re-examination which is the only circumstantial evidence offered by Plaintiffs which tends to contradict McIntyre’s denial. While that report can arguably be weighed as evidence that McIntyre should have known that the child abuse was continuing, its lack of a medical conclusion and its overall indecisiveness do not allow the report to stand for proof of McIntyre’s actual knowledge of continuing child abuse. Plaintiffs have produced no other evidence sufficient to establish that they will be able to satisfy the evidentiary burden at trial of proving McIntyre’s knowledge of the 114continuing child abuse. La. C.C.P. art. 968(C)(2). Therefore, at a minimum, by virtue of the evidence presented in support of McIntyre’s motion, Plaintiffs’ claims are reduced to charges that McIntyre should have known of the possibility of continuing child abuse. This does not amount to a charge of extreme and outrageous conduct intentionally directed at Plaintiffs to cause them severe emotional distress.
Likewise, we do not recognize, nor do Plaintiffs argue, any other claim or cause of action in tort which can be supported by McIntyre’s mere negligent failure to have interpreted the March 6 report as indicative of child abuse. We are not persuaded by Plaintiffs’ citation of the general obligations placed upon attorneys under the professional rules of conduct. McIntyre’s professional duty extended principally to his client, the mother of J.A., who is not alleged in any manner to be the abuser and who was responsible for seeking Dr. O’Boyle’s re-examination of J.A. In the severely contested Custody Proceeding, a separate attorney had been specifically appointed by the court to represent J.A. Under these circumstances, where the record shows that McIntyre was one of a large group of professionals involved in the investigation and review of the child abuse of J.A., we do not recognize that even the alleged failure on his part to properly interpret the March 6 report could amount to a breach of any duty to J.A. or Arledge.
The trial court, finding there was no genuine issue of material fact, correctly granted McIntyre’s motion for summary judgment.

Conclusion

Finding that the trial court correctly granted the Franklin Parish Defendants’ motion for summary judgment as to the claims for deprivation of constitutional civil rights, maintained McIntyre’s exception of no cause of action as to the claim for malicious prosecution and granted McIntyre’s motion for summary judgment 11sas to the claim for intentional infliction of emotional distress, we hereby affirm the trial court’s rulings. Costs of this appeal are assessed to appellants.
AFFIRMED.

. The Plaintiffs focus the allegations of their petition and their argument on the Franklin Parish Defendants acting under color of state law in the alleged deprivation of civil rights, 42 U.S.C. § 1983, and do not discuss a conspiracy to interfere with civil rights, 42 U.S.C. § 1985, or an action for neglect to prevent the wrongs conspired to be done, 42 U.S.C. § 1986. We will therefore consider these claims abandoned as to these defendants and only discuss the applicability of 42 U.S.C. § 1983. 42 U.S.C. § 1988 is a companion statute allowing the recovery of attorney's fees to the prevailing party for the enforcement of these civil rights provisions.

. Louisiana has adopted this doctrine of governmental immunity in La. R.S. 9:2798.1 which provides in pertinent part:
(B) Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy making or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
(C) The provisions of subsection B of this section are not applicable: ... (2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless or flagrant misconduct.

. From the pleadings, we note that there was no allegation of an outstanding discovery request in the Custody Proceeding at the time McIntyre received Dr. O’Boyle's report. The bald conclusion in the petition that McIntyre concealed the report is unsupported by an assertion of facts indicating a duty of the part of McIntyre to reveal anything to Arledge or his attorney.

. The rules concern candor toward the tribunal (Rule 3.3), fairness to the opposing party and counsel (Rule 3.4) and truthfulness in statements to others (Rule 4.1).

. The transcript of the July 28 hearing shows that the dispute involved Arledge’s motion for contempt for Mize interfering with and removing J.A. from therapy with Phyllis Taylor and not allegations of ongoing sexual abuse.