830 So.2d 581 (2002)
Charles L. SMART, Plaintiff-Appellant
v.
The KANSAS CITY SOUTHERN RAILROAD, et al., Defendant-Appellee.
No. 36,404-CA.
Court of Appeal of Louisiana, Second Circuit.
November 6, 2002.
*584 Richard L. Fewell, Jr., West Monroe, for Appellant.
Wilkinson, Carmody & Gilliam, by Arthur R. Carmody, Jr., Shreveport, for Appellee.
Before GASKINS, KOSTELKA and DREW, JJ.
GASKINS, J.
This case arises from an auto/train collision in which the plaintiff car driver, Charles L. Smart, was seriously injured. The plaintiff appeals from a trial court judgment which found in favor of the defendant, Kansas City Southern Railway Company (KCS). For the reasons set forth below, we affirm.

FACTS
On June 23, 1998, the 68-year-old plaintiff was traveling north in his 1991 Geo Prizm when he collided with an eastbound KCS train at the Thomas Road railroad crossing in West Monroe, Ouachita Parish. As a result of the accident, the plaintiff sustained severe and permanent injuries, including paralysis.
On September 24, 1998, the plaintiff filed suit against KCS and the Louisiana Department of Transportation and Development (DOTD). He alleged that the signal lights at the railroad crossing were inadequate to warn motorists of approaching trains. KCS answered, asserting that the crossing was protected by "advance warning signs, statutory crossbuck signs and red flasher lights, all of which were operating properly." It alleged fault by the plaintiff for failing to maintain a proper lookout, heed the warning signs or yield the right of way to the train, which was traveling at an authorized speed. The DOTD also answered, alleging the plaintiff's fault in several respects, including failing to maintain a proper lookout. It further asserted that all of the warning devices at the crossing were working properly. Both defendants requested a jury trial.
In March 2000, the trial court signed a judgment granting DOTD's motion for summary judgment and dismissing DOTD from the suit with prejudice at the plaintiff's cost.
A jury trial was held December 11-14, 2000. The trial court excluded from evidence a videotape demonstration offered in conjunction with the testimony of the plaintiff's expert, Robert William Halstead. The plaintiff sought an emergency writ from this court; the writ was denied on December 13, 2000, on the basis that the trial judge had broad discretion as to rulings on admissibility of evidence.
*585 The jury ruled against the plaintiff. In response to the first jury interrogatory "Was the defendant, Kansas City Southern Railway Company, negligent; and, if so, was the negligence a proximate cause of the accident?"the jury answered, "No." Judgment in conformity with the jury verdict was signed on January 18, 2001.
In February 2001, the plaintiff filed a motion for judgment notwithstanding the verdict (JNOV) and alternatively for new trial. The motion was denied in July 2001.
The plaintiff appealed.

EXPERT WITNESS

Videotape
The plaintiff claims that the trial court erred in refusing to admit into evidence a videotape demonstration prepared by Mr. Halstead, his expert in railroad and electrical engineering. The videotape showed two methods of aligning signal lights, the one suggested by Mr. Halstead and the one actually used by KCS. According to Mr. Halstead, if KCS had utilized his method of alignment, the flashing lights at the railroad crossing might have been more noticeable to a motorist approaching in the plaintiff's lane of traffic.[1] The plaintiff argues that the videotape corroborated and explained Mr. Halstead's testimony as to proper alignment procedure, a technical matter, and that its exclusion prejudiced the jury against Mr. Halstead.
KCS asserts that the trial court properly excluded Mr. Halstead's videotape as falling below the Daubert standards of reliability. According to KCS, the trial court's exclusion of the videotape was correct, particularly in view of the evidence that Mr. Halstead's method was used by no Louisiana railroad and only one of the six "class one" railroads in the United States.
The trial court is to act in a gate-keeping function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); State v. Foret, 628 So.2d 1116 (La.1993). The trial court's gatekeeping obligation also applies to testimony based on "technical" and "specialized" knowledge. Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); Safeco Insurance Company of America v. Chrysler Corporation, XXXX-XXXX (La.App. 3d Cir.7/31/02),  So.2d , 2002 WL 1772925.
The trial court's inquiry must be tied to the facts of the particular case. The abuse of discretion standard applies to the trial court's ultimate conclusion as to whether to exclude expert witness testimony and to the trial court's decisions as to how to determine reliability. Kumho, supra; Safeco Insurance Company of America v. Chrysler Corporation, supra.
Essentially, in fulfilling this gatekeeping role, the trial court must ensure that the proffered evidence is not only relevant, but reliable, following a flexible approach considering factors such as whether the technique can be (and has been) tested, whether it has been subjected. *586 to peer review and publication, whether there is a known or potential rate of error, and whether the relevant scientific/expert community generally accepts the technique. Rogers v. Horseshoe Entertainment, 32,800 (La.App.2d Cir.8/1/00), 766 So.2d 595, writs denied, 2000-2894 (La.12/8/00), 776 So.2d 463, and 2000-2905 (La.12/8/00), 776 So.2d 464.
The trial court sustained KCS' objection to the videotape on the basis that the experiment it showed was not conducted under "similar conditions." The instant accident occurred on a four-lane road at a railroad crossing maintained by KCS, a "class one" railroad; the crossing had six flashing lights, two mast-mounted and four on a cantilever extending over the roadway. The videotape demonstrating alignment procedures was filmed at a two-lane crossing of the Oswego and Hartford railway, a 27 mile shortline railroad in New York. Given the vastly different circumstances, including the signalizations, the trial court refused to admit the videotape.
The trial court has much discretion in allowingor disallowingevidence. In view of the great dissimilarities between the accident site and the demonstration site, we cannot say that the trial court abused its considerable discretion. Furthermore, even assuming arguendo that it was error to exclude the videotape, it was harmless since the expert was allowed to give a comparable demonstration in the courtroom with a flashlight.

Telephone Call
When plaintiff's counsel sought to introduce the videotape during Mr. Halstead's testimony, KCS counsel was allowed to traverse under Daubert. During this cross-examination, he inquired as to whether Mr. Halstead had ever asked Steve May, the manager of the Oswego and Hartford railway which was used in the videotape, what method he used to align his railroad's lights. Mr. Halstead replied that to his knowledge, they used the alignment procedure he advocated. At this point, the following exchange occurred:
Q. If I were to ask you to during the break to ... call the manager of that railroad on the telephone and ask him how they did that would you do that for me?
A. Yes, sir.
Q. Fine. You know his name?
A. Steve May.
Q. Right. And also ask him if he's talked to me and what he told me, okay?
A. Alright.
Plaintiff's counsel made no objection at this time. At a subsequent point, while Mr. Halstead was still on the witness stand and after the trial court had refused to admit the tape, KCS counsel renewed his efforts to have Mr. Halstead call Mr. May. Plaintiff's counsel then objected on the basis of hearsay. Reasoning that Mr. Halstead, as an expert, couldand in fact hadbased his opinion on such hearsay evidence as witness depositions and reports, the court directed Mr. Halstead to telephone Mr. May. Thereafter, Mr. Halstead's direct examination was resumed.
During his subsequent cross-examination by KCS counsel, Mr. Halstead was questioned as to his telephone conversation with Mr. May:
Q. Did not Mr. May say to the best of his knowledge that he did not follow your recommendations, you could check with somebody else who actually did the work if you wanted to?
A. Yeah.
On redirect, Mr. Halstead revealed that he had tried unsuccessfully to follow Mr. May's suggestion and contact the signal *587 maintainer for that railroad. Mr. Halstead also stated that he knew this particular signal maintainer and that the man had formerly worked for him.
While recognizing that the procedure utilized as to this telephone call was highly unusual, nonetheless, we do not find that it constituted reversible error. This is especially true given Mr. May's equivocal answer which specified that he was not aware of the procedures.

TESTIMONY OF INVESTIGATING OFFICER
The plaintiff contends that the trial court erred in allowing hearsay testimony from Trooper Tim Grigsby, one of the primary investigating officers, as to statements from accident witnesses about any problems with the crossing lights. He claims the trial court developed a "spontaneous investigation rule" not found in La. C.E. art. 801(D).
Trooper Grigsby was called as a witness by KCS. He testified that he and Trooper Tyrone Beckley, then a field trainee, investigated the accident. At the conclusion of their investigation, a citation was issued to the plaintiff for failure to yield. Trooper Grigsby further testified that he looked at the flashing lights from various angles and, based upon his observations, they were all visible to motorists and presented no problem. On direct examination, KCS counsel elicited the following testimony without objection:
Q. Did anyone at the scene that you talked with or that Officer [Beckley] talked to say or indicate in any way that there was any problem with the flasher lights at the crossing?
A. No. No one approached me indicating that there was a problem.
On redirect examination, KCS counsel asked him, "You did not receive any information from anyone that there was any problem with the lights did you?" Counsel for plaintiff made a hearsay objection. The court overruled the objection, finding that it was an exception to the hearsay rule "because it's spontaneous due to an investigation." The trooper answered that the three eyewitnesses who gave written statements did not say that there was a problem with the lights. To the contrary, they stated that the lights appeared to be working properly.
Hearsay admitted through this exchange was harmless as plaintiff's own counsel had already elicited the identical testimony from the other investigating trooper earlier in the trial. During the plaintiff's case, Trooper Beckley, the field trainee under Trooper Grigsby's supervision, was called as a witness. Plaintiff's counsel asked this witness, "Did you interview anyone whom indicated that the lights were not functioning properly?" The trooper's response was, "No, sir. Everyone that I interviewed and got witness statements from [said] the lights were functioning...."

JURY INSTRUCTIONS
In two of his assignments of error, the plaintiff asserts that the jury instructions given were improper and prejudicial.

Law
Adequate jury instructions are those which fairly and reasonably point up the issues and which provide correct principles of law for the jury to apply to those issues. Doyle v. Picadilly Cafeterias, 576 So.2d 1143 (La.App. 3d Cir.1991); Evangeline Farmers Cooperative v. Fontenot, 565 So.2d 1040 (La.App. 3d Cir.1990). The trial court is not required to give the precise instruction submitted by a litigant. The court need only give instructions that properly reflect the applicable law and adequately convey the issues to the jury. To determine the sufficiency of a jury charge, *588 all charges should be read together as a whole. Luman v. Highlands Insurance Company, 25,445 (La.App.2d Cir.2/23/94), 632 So.2d 910. If the court gives misleading, confusing instructions or omits an applicable essential legal principle, then such instructions do not adequately set forth the law and may constitute reversible error. Evangeline Farmers Cooperative v. Fontenot, supra.
Appellate courts exercise great restraint in overturning a jury verdict on the basis of erroneous jury instructions. The pertinent inquiry in making such a determination is whether the jury was misled to such an extent as to prevent it from doing justice. The manifest error standard of review may not be ignored unless the instructions were so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and facts. Creel v. S.A. Tarver & Son Tractor Co., Inc., 537 So.2d 752 (La.App. 1st Cir.1988); Kennedy v. Thomas, 34,530 (La.App.2d Cir.4/4/01), 784 So.2d 692.

"Convincing"
On page two of the jury instructions, the jurors were informed as to the weight and credibility accorded to the evidence. In relevant part, the instructions state:
You are not bound to decide any issue of fact in accordance with the number of witnesses or exhibits presented on that point. Witnesses are weighed and not counted. Your function is to determine the facts and this is not done by counting noses. The test is not which side brings the greater number of witnesses or exhibits before you, or presents greater quantity of evidence, but rather which witnesses or exhibits and which evidence appeals to your minds as being the most accurate and the most convincing. [Emphasis added.]
According to the plaintiff, the use of the word "convincing" could have been confusing to the jury. He claims that the jury charge did not include a "clear and accurate description of proof that should be used in negligence cases."
However, a careful review of the jury instructions in their entirety belies the plaintiff's contentions. They clearly and decisively set forth the burden of proof to be met by the plaintiff in a negligence case and define the meaning of "preponderance of the evidence."

Maintenance of Flashers
The plaintiff attacks as incomplete the following portion of the jury charge:
The railroad must take additional steps to warn motorists of a train's approach, other than ringing of the bell or blowing the horn, only when the crossing is found to be extra-hazardous, that is, where the physical circumstances are such that stopping, looking and listening will do the motorist no good or that he must place himself in a perilous position to discover an approaching train.
The plaintiff sought the addition of the following sentence: "If flashers are used as a warning device then the exercise of reasonable care is required in the maintenance and alignment of such warning devices." He argues that the instruction given failed to impart any duty upon KCS to maintain the railroad crossing it constructed.
However, review of the entire instructions reveals that the jury was fully and adequately informed as to the railroad's duty to operate its crossing such that it could be safely traversed by motorists using reasonable care and to take all "reasonable precautions" to maintain grade crossing safety.
The jury instructions given in the instant case were not inadequate or misleading. *589 Accordingly, we find that these assignments of error are without merit.

MOTION FOR JNOV/NEW TRIAL

Law
A JNOV is a procedural device authorized by La. C.C.P. art. 1811 whereby the trial court may correct a legally erroneous verdict by modifying fault or damages, or both, that the jury may have assessed. Matthews v. Arkla Lubricants, Inc., 32,121 (La.App.2d Cir.8/18/99), 740 So.2d 787. The motion should be granted only when the evidence points so strongly in favor of the party seeking the JNOV that reasonable men could not reach different conclusions. Kennedy v. Thomas, supra.
The JNOV should not be granted merely when there is a preponderance of evidence for the mover. If the opposing evidence is of such quality and weight that reasonable men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all inferences or factual questions should be resolved in favor of the nonmoving party. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991); Craighead v. Preferred Risk Mutual Insurance Co., 33,731 (La.App.2d Cir.8/25/00), 769 So.2d 112, writ denied, 2000-2946 (La.12/15/00), 777 So.2d 1230; Kennedy v. Thomas, supra.
In reviewing the trial court's ruling on the JNOV motion, we inquire whether the facts and inferences established on the record point so strongly in favor of the mover that reasonable men and women could not have reached the conclusion reached by the jury. Johnson v. English, 34,322 (La.App.2d Cir.12/20/00), 779 So.2d 876.
La. C.C.P. art.1972 provides, in pertinent part, that a new trial shall be granted when the verdict or judgment appears clearly contrary to the law and the evidence. The trial court has great discretion in determining whether to grant or deny a motion for a new trial, and its determination will not be disturbed absent an abuse of that discretion. Poland v. Poland, 34,085 (La.App.2d Cir.12/6/00), 779 So.2d 852.

Discussion
The Thomas Road crossing where the plaintiff was injured was controlled by four traffic control devices: (1) a yellow "RXR" railroad crossing advance sign located several hundred feet south of the crossing; (2) a white "RXR" railroad crossing marker painted in large letters on the roadway; (3) a statutory reflectorized crossbuck "Railroad Crossing" sign just south of the crossing; and (4) six flashing lights, two mast-mounted and four mounted on a cantilever extending over the roadway.
The investigation of the accident revealed that the plaintiff was traveling north in the right or outside lane of traffic and that he ran into the right front side of the engine. A nephew riding with the plaintiff noticed the oncoming train and called out a warning to the plaintiff.[2] Skid marks from the plaintiff's vehicle were from 18 to 21 feet, indicating that he had attempted to stop.
Analysis of the locomotive's "black box" showed that its horn or whistle was sounded when the train was 2,100 to 2,200 feet away from the crossing and that it blew for about 32 to 34 seconds before the *590 collision. At this time, the train was traveling approximately 45 mph; the maximum operating speed in this area was 49 mph. After the engineer put the train in emergency, it stopped in about a quarter of a mile and within 38 seconds.
Examination of the shunt operating the flasher lights showed it to be in normal working condition after the accident. According to evidence presented at trial, the system for the flasher lights was designed so that when a train passed a certain point, a motion detector was activated and the lights began to flash. Although the minimum warning time prescribed by the Federal Railroad Administration is 20 seconds, KCS utilized a longer period of 25 seconds for the lights to flash before the train reached the crossing.
The plaintiff relied primarily upon the testimony of Herman Dean Campbell and Carolyn Gregory as witnesses to the accident. However, neither of them had identified themselves as witnesses to the police nor given a statement to law enforcement authorities.[3]
Mr. Campbell, a mechanic, testified that he was driving southbound toward the railroad crossing when the flashing lights and the train appeared to him at the same time. He hadn't noticed the lights being on at all; when he saw them, he described them as "very very dim." He was perhaps 100 to 150 yards from the tracks. According to Mr. Campbell, he did not hear the train blow its whistle before the accident.
Ms. Gregory testified that she was walking in the same direction that the plaintiff was driving. She was walking on the left-hand side of the road, facing the traffic.
At the time of the accident, she was about 100 feet away from the crossing. She testified that she heard the train whistle. Two seconds later, she heard the train cars clattering on the track. The train then skidded like it was trying to lock its brakes down. She heard the train blow its horn two times. According to Ms. Gregory, the lights and the bells on the track began to work a few seconds after the collision, after the train stopped. She estimated that the plaintiff was traveling 45 mph, then applied his brakes. She thought he was going about 40 mph when he struck the train.
KCS produced the testimony of Dorothy Anita Allen, a social worker who was driving in the same direction as the plaintiff. She was traveling in the inside northbound lane. As she approached the railroad crossing, she saw the lights flashing and heard the bells; she pulled to a complete stop. She did not initially see the train. After she came to a complete stop, she heard the train whistle, which blew continuously. Several more seconds passed before she saw the train. Then she observed the plaintiff's car approaching from behind in the outside lane. She stated to her teenage daughter, who was a passenger in her truck, that that man was going to get hit by the train. She saw the actual impact. The plaintiff's car did not appear to reduce its speed before hitting the side of the train. Ms. Allen called 911 for emergency assistance. She told the police that she witnessed the accident and gave a statement.
Another witness for KCS was Doris Cartledge. Her home is located northwest *591 of the railroad crossing. She testified that on the day of the accident she heard the train whistle in the normal way 17 to 20 seconds before it reached the crossing. She also heard the bell noise made when the lights at the crossing go on. She saw the lights come on before the accident.
Conflicting evidence was presented from the various witnesses to the plaintiff's accident. Whereas the plaintiff's witnesses claimed that the flashing lights were slow to activate and/or dim and that they heard no timely audible warnings, the defendant presented testimony that all of the warnings were functioning and that the plaintiff was injured through his own lack of attention. The facts and evidence presented by the defendant were of such quality and weight that reasonable men in the exercise of impartial judgment could reach different conclusions. Therefore, the trial court did not err in refusing to grant the plaintiff's motion for JNOV.
The plaintiff also sought a new trial on the basis that the jury verdict was contrary to the law and the evidence offered at trial. La. C.C.P. art.1972. However, our review of this record reveals no abuse of the trial court's discretion in denying the plaintiff's motion for new trial.

CONCLUSION
The trial court judgment against the plaintiff, Charles L. Smart, and in favor of the defendant, Kansas City Southern Railway Company, is affirmed. Costs of this appeal are assessed against the plaintiff, Charles L. Smart.
AFFIRMED.
NOTES
[1] The method of alignment suggested by Mr. Halsteadand recommended by the American Railway Engineering Maintenance Away Association (AREMA), an advisory committeeinvolves moving the red roundel lens of the light down and then adjusting the flasher head. When it is perfectly aligned, there is a bright flash from the light. The method of alignment used by KCSand four of its fellow "class one" American railroadsdoes not require lowering the roundel lens while adjusting the light.
[2] The plaintiff's nephew did not testify at trial.
[3] The plaintiff also called Richard Post on rebuttal. He testified that he was traveling south at the time of the accident and that he did not notice the lights flashing. Unfortunately, Mr. Post's testimony is, at best, confusing, and the record is far from clear as to what, if anything, he told the investigating troopers. When KCS counsel showed Mr. Post a state police document purportedly signed by him, he did not acknowledge the signature.