1 .MOORE, J.
The plaintiff, Loyd Donald Oliveaux (represented by his sister, Jennifer 0. Berry, and referred to herein as “Oliveaux”), appeals a jury verdict that rejected his wrongful death claims against St. Francis Medical Center, Dr. Camille Perkins, and the State of Louisiana, Department of Social Services, Child Protection Service (“CPS”), for the death of his 23-month-old daughter, Haley. Oliveaux urges that the jury charge and other procedural errors tainted the jury’s consideration of the case, mandating a de novo review of the record. For the reasons expressed, we affirm.

Factual Background

Haley was born in January 1992. By late 1993, her father, Oliveaux, was separated from her mother, Allison Oliveaux (“Allison”), and was in the Ouachita Correctional Center on a probation violation. Haley was spending part of her time with Allison’s parents, the Laytons, and the rest with Allison and her boyfriend, Jimmie Christian Duncan. Haley had to spend considerable time with Duncan, as he apparently stayed at the couple’s West Monroe apartment while Allison was at work.
On November 29, 1993, Duncan took Haley to her pediatrician, Dr. Bulloch, with a swollen scalp and forehead. Duncan said that while trying to reach a piggy bank placed on a chest of drawers, Haley had stepped on the open bottom drawer and the whole chest fell over; the child had landed on the floor with the chest on top of her. Dr. Bulloch immediately sent Haley to St. Francis, where CT scans showed she had fractures on three different parts of her skull and a subdural he-matoma. At trial, several physicians testified that injuries this severe could not have been accidental, |2and were in fact more consistent with “shaken infant syndrome.”
Haley spent four days in the St. Francis pediatric intensive care unit (“PICU”) and then two more on the pediatric floor. During this time, family members grew suspicious of Duncan’s account of the injuries; on December 2, Allison’s father, Bill Layton, related their concerns to Dr. Perkins, director of the PICU. Dr. Perkins called a St. Francis social worker, Sister June Myer, who in turn called CPS and requested an investigation. Apparently Sr. June failed to report, or the CPS intake worker failed to record, that Haley had three skull fractures, because CPS designated the case a “Level III” priority, “unspecified physical abuse,” rather than “Level I” or “high priority.” CPS assigned the case to a case worker, Connie Griffon (now known as Connie Pace), on the afternoon of December 2.
The next day, December 3, Ms. Pace and West Monroe Police Detective Tim Zeigler held several interviews at St. Francis. Sister June told them Duncan’s version of the accident, but said she had noticed no “inappropriate conduct” at the hospital by either Allison or Duncan; the Laytons were irritated because they were not allowed in PICU while Duncan was. Dr. Perkins told them that Haley had three skull fractures and numerous bruises, but that these were consistent with the history; she suspected not child abuse, but friction between Duncan and the Laytons. Ms. Pace and Det. Zeigler also interviewed two PICU nurses, neither of whom voiced any concern about child abuse; one of them, Nurse Strickland, said Haley called Duncan “daddy.” They also interviewed Mr. Layton, who admitted he was “not crazy about” Duncan and did not see how the child |scould be so seriously hurt by a falling chest of drawers, but did not say he suspected Duncan of child abuse. Allison’s sister, Carole Gwin, told them there was much violence between Allison and Duncan, but she had never seen any marks on Haley.
*1269 Later that afternoon, Ms. Pace and Det. Zeigler interviewed Allison and Duncan at the West Monroe Police Department. Allison said she was not at home when the accident occurred; Duncan gave a slightly different account of the chest-of-drawers incident. Ms. Pace and Det. Zeigler then went to Allison and Duncan’s apartment on Copley Street and examined the chest of drawers. Det. Zeigler noted that the bottom drawer was “cocked” just as Duncan had said, and felt that this corroborated the story. Finding that the injuries could have been accidental, he did not pursue criminal charges.
On December 4, Haley was discharged from St. Francis; she spent a few days with her grandparents, the Laytons, and then returned to Allison and Duncan.
The following’ Monday, December 6, Ms. Pace interviewed Haley’s grandmother, Julie Layton, and a daycare operator, Cathy Reed, and concluded she did not have enough evidence to substantiate a claim of child abuse. She did not call another daycare operator, Debra Craighead, whose name Allison had provided. On December 8, she sent a request to St. Francis for Haley’s medical records. These showed that Haley had been admitted to the emergency room three times in the preceding month; however, CPS did not receive the records until December 17. By that time, |4Ms. Pace and her supervisor, Linda Foster, had invalidated the case for unspecified physical abuse.
On Saturday, December 18, an ambulance carried Haley to the emergency room of Glenwood Regional Medical Center in West Monroe, with the report that she had drowned in a bathtub. When she arrived she was blue and could not be revived. After she was pronounced dead, doctors noticed that her anus and rectum were abnormally distended. Dr. Norwood, director of the emergency room, testified that she had multiple tears and scars, some fresh and some older, suggesting that she had been sexually abused over a period of time. The coroner, Dr. Hayne, confirmed the presence of injuries but did not feel that any were “old.”
Oliveaux filed this wrongful death and survival action in December 1994 against Duncan, St. Francis and CPS. Oliveaux was killed in a train accident in late 1996, and his sister was substituted as party plaintiff. By amended petitions, Oliveaux added Dr. Perkins as a defendant and dismissed Duncan, noting the latter had been convicted of capital murder in Haley’s death and was on death row. The matter proceeded to an eight-day jury trial in December 2003.
In response to a special verdict form, the jury declined to find (1) that any employee of CPS was grossly negligent and that this gross negligence was a cause of Haley’s injuries; (2) that Dr. Perkins breached the standard of care for pediatricians and that her breach was a cause of Haley’s injuries; (3) that the nurses at St. Francis breached the standard of care for nurses, and that their breach was a cause of Haley’s injuries; and (4) that any social | ¡^service worker at St. Francis was negligent and that this negligence was a cause of Haley’s injuries. The jury further found that the fault of a non-party was the legal cause of Haley’s injuries, assessing that fault at 100%. Finally, the jury found that Dr. Perkins was not an employee of St. Francis at the time of the events in question. The district court signed judgment in due course dismissing all claims.
Oliveaux has appealed, raising five assignments of error. He does not contend that the verdict was plainly wrong; thus the issue of manifest error is not properly preserved for appeal. URCA Rule- 1-3; Steed v. St. Paul’s United Methodist Church, 31,521, p. 6 (La.App. 2 Cir. 2/24/99), 728 So.2d 931, 938, writ denied, 99-0877 (La.5/7/99), 740 So.2d 1290.

*1270
Discussion: Qualified Immunity

By his first two assignments of error, Oliveaux urges the district court erred in ruling, prior to trial and without examining the evidence, that CPS was entitled to qualified immunity as a matter of law, and that the court erroneously charged the jury regarding qualified immunity. He concedes that two statutes appear to confer qualified immunity. He contends, however, that the “discretionary act immunity” of La. R.S. 9:2798.1 does not apply because CPS made no showing that its employees’ conduct was based on policy considerations, and the caseworker immunity of La. Ch. C. arts. 611 and 612 G does not apply because it extends only to caseworkers, not to the public entities by whom they are employed. In support he cites Hawkins v. State, 543 So.2d 1052 (La.App. 4 Cir.1989), and Todd v. State, 96-535 (La.App. 5 Cir. 11/26/96), 685 So.2d 313, rev’d, 96-3090 (La.9/9/97),6 699 So.2d 35. Since CPS was not entitled to statutory immunity, Oliveaux contends that the district court should have charged the jury that in order to find liability, the plaintiff had to prove only ordinary (not gross) negligence. Lenard v. Dilley, 2001-1522 (La.1/15/02), 805 So.2d 175. By supplemental brief, Oli-veaux argues this error was significant, as the jury asked the court for a further explanation of the term “gross negligence.”
CPS replies that in Todd v. State, supra, the supreme court recognized qualified immunity in favor of CPS in cases involving the removal of a child from his home by a social worker. It adds that lower courts have recognized CPS’s qualified immunity in the context of civil rights claims under 42 U.S.C. § 1983. Arledge v. Sherrill, 32,-189 (La.App. 2 Cir. 8/18/99), 738 So.2d 1215, writ denied, 99-2713 (La.12/10/99), 751 So.2d 255; Mayronne v. Vaught, 94-2140 (La.App. 4 Cir. 4/13/95), 655 So.2d 390. It submits that the trial testimony fully supports a finding that the caseworkers exercised discretionary acts within the course and scope of their lawful powers and duties as CPS agents. With this legal and factual background, CPS contends the jury charge regarding gross negligence was appropriate and not erroneous.
In Todd v. State, supra, the supreme court held that the duty of a child protection caseworker and the CPS is delineated by La. Ch. C. arts. 611 and 612, and by La. R.S. 9:2798.1, which provide in pertinent part:
Art. 611. Immunity from civil or criminal liability
A. Any person who in good faith makes a report, cooperates in any investigation arising as a result of such report, or participates in judicial proceedings authorized under the provisions of this Chapter, or any caseworker who in good \ifaith conducts an investigation, makes an investigative judgment or disposition, or releases or uses information contained in the central registry for the purpose of protecting a child, shall have immunity from civil or criminal liability that otherwise might be incurred or imposed.
Art. 612. Assignment of reports for investigation and assessment
G. The Department of Social Services shall set priorities for case response and allocate staff resources to cases identified by reporters as presenting immediate substantial risk of harm to children. Absent evidence of willful or intentional misconduct or gross negligence in carrying out the investigative functions of the state child protection program, caseworkers, supervisors, program managers, and agency heads shall be immune from civil and criminal liability in any legal action arising from the department’s decisions made relative to the setting of priorities for cases and targeting of staff resources.
*1271 § 2798.1. Policymaking or discretionary acts or omissions of public entities or their officers or employees
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or their failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
(Emphasis added.)
The wrongful death action in Todd arose from the suicide of an 11-year-old boy two days after he had been removed from his mother’s custody because of a report of child abuse. The mother contended that the state agency was negligent for failing to properly investigate the unsubstantiated allegations of abuse and the boy’s history of mental difficulties, and in failing to personally interview the mother within 24 hours of the report. The supreme court stated that in- order for the plaintiff to recover, she must show the caseworker and the state agency “breached their duty to investigate, and thereby caused” the boy’s death, and “there must be a proximate relation |sbetween the alleged negligence and the injury.” 699 So.2d at 39. The court closely reviewed the caseworker’s conduct and the agency’s manual. Regarding the agency’s duty, the court stated:
Decisions involving the removal of a child from his home clearly lie within the scope of the duty and authority of social workers. Susan Abbott, Liability of the State and its Employees for the Negligent Investigation of Child Abuse Reports, 10 Alaska L.Rev. 401 (1993). Such decisions require personal deliberation and judgment. Although provided with guidelines, social workers are not merely performing a duty in which, they are given no latitude for action. Id. The manner in which the investigation is conducted is one of discretion, unless the investigation is so incomplete that it could not be found to be thorough. Jensen v. Anderson County DSS, 304 S.C. 195, 403 S.E.2d 615, 620 (1991).
■Oliveaux contends the supreme court ultimately held that the plaintiff in Todd “failed to establish the legally causative link” between the caseworker’s actions and the death. Id., at 44. Because the issue was cause, Oliveaux argues that the court’s reference to “deliberation and judgment” was obiter dictum and does not mandate a finding of discretionary act immunity under the statutes.
We disagree. The supreme court’s discussion of the caseworker’s duty is cogent and integral to the case. Notably, the court expressly found that the caseworker’s actions were not unreasonable, as she had no evidence on which to find that the boy was suicidal. 699 So.2d at 43. This finding of deliberation and judgment, and the citation of Ch. C. arts. 611, 612 and R.S. 9:2798.1, were critical to the finding that the state agency was not liable for the caseworker’s allegedly negligent acts.
Similarly, the instant record supports a finding that the conduct of the CPS workers met the criteria of the statutes and was not grossly negligent. |9Ms. Foster, the case supervisor, testified that CPS’s goal is to protect children and observe the family’s right to privacy. Interfering with a family’s privacy, and the potential trauma to a child from removal, are major concerns for caseworkers. She farther testified that although this case was mistakenly designated as “Level III,” Ms. Pace actually performed a “Level I” investigation by beginning the required interviews within 24 hours.[1] In these interviews, neither Dr. *1272 Perkins nor Sr. June expressed any suspicion of abuse; the police detective felt Haley’s injuries were consistent with the accident reported by Duncan; and family members voiced concerns about Duncan other than possible child abuse.
Although they were bound by the guidelines of the Program Policy Manual, Ms. Pace and Ms. Foster were clearly required to exercise professional judgment and discretion in assessing the claim of abuse and deciding whether to remove Haley from her mother and Duncan. For this reason, the district court did not err in holding that CPS was entitled to the qualified immunity of Ch. C. arts. 611, 612 and R.S. 9:2798.1.
The opinion of Hawkins v. State, supra, on which Oliveaux greatly relies in brief, does not alter this conclusion. Hawkins, which predated the | inChiIdren’s Code, was only a summary judgment in which the Fourth Circuit refused to apply R.S. 9:2798.1 because the state failed to make a “threshold showing that its actions were either ‘discretionary’ or ‘policy-making’ ” and genuine issues remained whether its conduct was “willful, outrageous, reckless or flagrant” under the former La. R.S. 14:403 E. By contrast, the evidence introduced herein overwhelmingly meets the criteria of both Ch. C. arts. 611 and 612 and R.S. 9:2798.1.
Oliveaux does not urge that the verdict absolving CPS is plainly wrong, but he alleges six deficiencies in the investigation and failure to comply with the Program Policy Manual. Because neither Dr. Perkins nor Sr. June gave Ms. Pace any information “documenting the existence of any abuse and/or neglect,” resort to a “second professional collateral” did not appear to be required. As in Todd, supra, an omniscient caseworker might have foreseen Duncan’s abusive propensity and thus averted Haley’s tragic death. However, this record establishes substantial compliance with the Program Policy Manual, and no evidence that would remove CPS from the qualified immunity of the statutes.
Because of this conclusion, there is no merit to the contention that the district court erred in instructing the jury that the plaintiff must show gross negligence. Moreover, the particular charge is not confusing.[2] It closely tracks the standard *1273 jury instruction listed in Alston Johnson, Civil Jury Instructions, 18 La. Civ. L. Treatise, § 3.13 (West Group, ©2001), and was followed by the supreme court in Lenard v. Dilley, supra.
Finally, Oliveaux suggests that the jury form was drafted in such a manner that it was impossible to separate the jury’s findings on fault from the jury findings on causation.[3] The cumulation of liability and legal causation issues into one verdict form is within the discretion of the district court. Johnson v. First Nat’l Bank of Shreveport, 2000-870 (La.App. 3 Cir. 6/20/01), 792 So.2d 33, turits denied, 2001-2770, 2783 (La.1/4/02), 805 So.2d 212, 213; Young v. First Nat’l Bank of Shreveport, 34,214 (La.App. 2 Cir. 8/22/01), 794 So.2d 128, writs denied, 2001-2642 (La.1/4/02), 805 So.2d 209, 2001-2672 (La.3/22/02), 811 So.2d 936. In light of the extensive evidence regarding the CPS agents’ investigation, and the sufficiency of the jury charge, there is no showing of prejudice. Smith v. Lincoln Gen'l Hosp., 27,133 (La.App. 2 Cir. 6/21/95), 658 So.2d 256, writ denied, 95-1808 (La.10/27/95), 662 So.2d 3. These assignments of error lack merit.

Jury Charge

By his third assignment, Oliveaux urges the district court’s jury charge presented the issues in an incorrect and unbalanced manner. He cites four specific errors: (A) Failure to instruct the jury that it may apportion fault between negligent and intentional tortfeasors; (B) Erroneous instruction that a later act of fault is an independent, intervening cause | ^whieh “prevents” the imposition of liability on a tortfeasor earlier in the time sequence; (C) Erroneous instruction on independent contractor status; and (D) Failure to instruct the jury on the elements of damage recoverable in a survivorship case. He also urges that, taken as a whole, the jury charge presented the issues in such an unclear and unbalanced fashion that de novo review is required. Bujol v. Entergy Services Inc., 2003-0492 (La.5/25/04), — So.2d -, 2004 WL 1157413, rehearing granted (La.10/29/04). He concedes that he made no contemporaneous objection to errors (A) and (B), but urges that under the circumstances, he had no opportunity to object. Smith v. Tiblier, 374 So.2d 685 (La.App. 4 Cir.), writ denied, 375 So.2d 646 (1979). He also argues that contemporaneous objection is not strictly required “when jury instructions or interrogatories contain a ‘plain and fundamental’ error.” Chatelain v. Rabalais, 04-28 (La.App. 3 Cir. 7/7/04), 877 So.2d 324.
St. Francis submits that Oliveaux failed to object to errors (A) and (B); Dr. Perkins urges that he also failed to object to error (D); thus they argue these issues are waived. La. C.C.P. art. 1793 C; Kose v. Cablevision of Shreveport, 32,855 (La.App. 2 Cir. 4/5/00), 755 So.2d 1039, writ denied, 2000-1177 (La.6/16/00), 764 So.2d 964. St. Francis further argues that even without waiver, the jury charge adequately and fairly addressed the issues and provided the correct principles of law for the jury’s consideration. Smart v. Kansas City Southern R., 36,404 (La.App. 2 Cir. 11/6/02), 830 So.2d 581, and citations therein.
On this record, we find no waiver. Before trial, Oliveaux filed a brief on the issue of damages recoverable in a wrongful death and survival case. |13On the final day of jury selection, December 11, he *1274 filed requested jury charges which included the allocation of fault between negligent and intentional tortfeasors.[4] After the parties rested on December 17, the court held an off-the-record 4}é-hour charge conference. It is not clear what objections were raised in the conference or when the court gave its final charge to counsel. The next morning, December 18, the parties gave closing arguments and the court charged the jury. After the jury retired, the court allowed counsel to state objections for the record. Because of Oli-veaux’s timely written motions and the lack of a transcript of the charge conference, we are satisfied that counsel preserved all the assigned errors for appeal.
(A) Allocation of fault. Oliveaux contends the district court refused to specifically instruct the jury that fault can be apportioned between negligent and intentional tortfeasors. Without citation of authority, he submits that this omission, in and of itself, constitutes reversible error. The court charged the jury as follows:
In a negligence action, the plaintiff must also show that the defendant’s conduct caused or was a substantial factor in her injury. Plaintiff need not show that defendant’s conduct was the only cause of the harm. Nor must he negate all other possibilities. Rather, he must show by a preponderance of the evidence, or more probably than not, that he suffered the injury because of the defendant’s conduct.
* ❖ *
Under the law, you must decide whether any other person or entity, even if not a party to this lawsuit, was at fault, 114and if so, whether such fault was a legal cause of plaintiffs damages. If such fault was a cause of plaintiffs damages, you must determine the degree of such fault, expressed as a percentage.
Although this charge does not explicitly direct the jury to apportion fault between negligent and intentional tortfeasors, it expresses the basic concept of La. C.C. art. 2323 A:
In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty[.]
In short, the trier of fact shall determine the degree or percentage of fault of all persons found to have contributed to or caused the injury. SS v. State, 2001-943 (La.App. 3 Cir. 3/19/03), 846 So.2d 871. This charge fairly and reasonably identified the issue of allocation of fault and provided correct principles of law for the jury’s consideration. Smart v. Kansas City Southern, supra.
(B) Independent and intervening cause. Oliveaux contends the following instruction was “a flatly incorrect statement of law which is not counterbalanced by a clear statement of the correct principles”:
When an accident results from two acts of negligence, one more remote and one occurring later, the presence of the latter cause prevents the finding of liability on one responsible for the more remote cause.
Oliveaux argues that this misled the jury into disregarding Dr. Perkins’s negligent *1275 physical examination and CPS’s inadequate investigation because they were followed by Duncan’s murderous actions.[5]
|1sThe court’s charge tracks the model charge in Johnson, supra, § 3.25, and was explicitly approved in Arcadian Corp. v. Olin Corp., 2001-1060 (La.App. 3 Cir. 5/8/02), 824 So.2d 396, writ denied, 2002-1930 (La.10/25/02), 827 So.2d 1174. This charge fairly and reasonably identified the issue of superseding cause and provided correct principles of law for the jury’s consideration. Smart v. Kansas City Southern, supra.
(C) Independent contractor status. Oliveaux contends the court gave an incorrect and inaccurate instruction, designed to obtain a jury finding that St. Francis was not vicariously liable for the actions of Dr. Perkins:
Generally, employers are answerable for the damages occasioned by their servants and overseers in the exercise of the functions in which they are employed. La. C.C. art. 2320. The concept established by La. C.C. art. 2320 is called “vicarious liability.” However, vicarious liability does not apply when an independent contractor relationship exists.
A principal generally is not liable for the negligence of an independent contractor while performing his contractual duties.
The distinction between employee and independent contractor status is a factual determination to be decided on a case-by-case basis.
The existence of an independent contractor agreement is not necessarily dis-positive of the issue of whether a doctor is an independent contractor, as opposed to an employee of a hospital, and courts will inquire as to the real nature of the relationship and the degree of control exercised or ability of control by the hospital over the doctor’s activities.
The independent contractor relationship exists when the work is of an independent nature with the independent contractor using his/her own judgment as to the best way to perform the task.
|1fiA principal is entitled to maintain supervisory control over work performed by an independent contractor in order to insure compliance with the contract terms.
It is when the principal exercises operational control of the work that the status of independent contractor may be in doubt.
Mere inspection of the work done by an independent contractor and direction as to the final results of the project is insufficient to support a conclusion that the principal has retained enough control over the project to defeat the principal/ independent contractor immunity.
The charge tracks, almost verbatim, this court’s summary of the law of the status of contract physicians in Campbell v. Hospital Service Dist. No. 1, 33,874 (La.App. 2 Cir. 10/4/00), 768 So.2d 803, writ denied, 2000-3153 (La.1/12/01), 781 So.2d 558. It properly identifies the degree of supervision and control over the alleged contractor’s work as an important factor in determining her status. Fuller v. U.S. Aircraft Ins. Group, 530 So.2d 1282 (La.App. 2 Cir.), writ denied, 543 So.2d 444 (1988), cert. denied, 490 U.S. 1046, 109 S.Ct. 1954, 104 L.Ed.2d 424 (1989); Nippa v. Chevron USA, 99-2953 (La.App. 4 Cir. 11/15/00), 774 So.2d 310, writ denied, 2000-3420 *1276 (La.2/9/01), 785 So.2d 823. This charge fairly and reasonably identified the issue of independent contractor status and provided correct principles of law for the jury’s consideration. Smart v. Kansas City Southern, supra.
(D) Elements of damage. Oli-veaux contends the court failed to instruct the jury on the elements of damage recoverable in a survivorship claim, and used the term “survivorship” in the jury form without defining it. He contends that without knowing what damages were com-pensable, the jury could not have assessed the legal cause of those damages.
117The court charged the jury as follows:
In an action such as this one, Louisiana law permits plaintiff as the surviving beneficiaries [sic ] of Haley Oliveaux to present evidence of certain losses that may have been suffered by the deceased prior to death and for which you may award damages. These damages may include conscious pain and suffering by the deceased prior to her death, as well as funeral expenses which may have been incurred.
Oliveaux correctly shows that this charge does not specifically define “survival claim,” while the jury form contains a line for “Survival claim of Haley Oliveaux.” Better symmetry between the charge and the form would be desirable. However, the charge tracks the model jury instruction in Johnson, supra, § 18.13, is based on the analysis in Cheatham v. City of New Orleans, 378 So.2d 369 (La.1979), and is an abridged version of the discussion in Etcher v. Neumann, 2000-2282 (La.App. 1 Cir. 12/28/01), 806 So.2d 826, writ denied, 2002-0905 (La.5/31/02), 817 So.2d 105.
This charge fairly and reasonably identified the issue of survival damages and provided correct principles of law for the jury’s consideration. Smart v. Kansas City Southern, supra.
(E) General unfairness. Oliveaux contends the jury charge, taken as a whole, fails to present the issues in a clear and balanced fashion. He complains the plaintiffs “are not presented to the jury as persons who have the right to compensation if the case is proved” but rather as “mere beggars.” He also argues that the court adopted the defendants’ proposed jury charge, the product of “snipping pieces from appellate decisions and stringing together the bits that are favorable to [their] own side.”
11RRegarding burden of proof, the charge stated:
The plaintiff has the burden of proving every element of his cause of action and, in addition to proving fault, he must also establish a causal link between the defendant’s acts or omissions and his damages.
In a suit such as this one, negligence or fault is never presumed and the plaintiff bears the burden of establishing his claims to a legal certainty by a reasonable preponderance of the evidence. Mere possibilities and even unsupported probabilities are insufficient to support a judgment.
This is a summary of the general burden of proof expressed in Lasha v. Olin Corp., 93-0044 (La.10/18/93), 625 So.2d 1002, 25 A.L.R. 5th 872, and Prim v. City of Shreveport, 297 So.2d 421 (La.1974). The charge fairly and adequately identified the issue for the jury. Smart v. Kansas City Southern, supra.
Oliveaux’s blanket objection to the jury charge, without specific grounds, did not provide the district court with a fair opportunity to correct erroneous or improper charges. Kose v. Cablevision of Shreveport, supra; Sanders v. Bain, 31,362 (La. App. 2 Cir. 9/12/98), 722 So.2d 386; Luman v. Highlands Ins. Co., 25,445 (La.App. 2 Cir. 2/23/94), 632 So.2d 910. It also *1277 does not provide this court with any basis for reversal. The district court is not obligated to give the precise charge requested by the parties, but one that correctly reflects the relevant issues and law. La. C.C.P. art. 1793; Ferrell v. Minden Family Care Center, 30,088 (La.App. 2 Cir. 12/19/97), 704 So.2d 969, writ denied, 98-0392 (La.3/27/98), 716 So.2d 891. For the reasons already expressed, this jury charge does not present any specific errors or improprieties, general unfairness or lack of balance, or “plain and fundamental error” such as was found in Chatelain v. Rabalais, supra.
113This assignment of error lacks merit.

Closing Argument

By his fourth assignment, Oli-veaux urges the district court did not give plaintiffs counsel adequate time to present closing argument. He contends that even though the attorneys received equal time to argue, “one plaintiff attorney stood opposite a team of defense attorneys.” Without elaboration, he argues this limited his opportunity to explain how the law applied to the case.
Dr. Perkins responds that Oliveaux did not object to the allocation of time for closing arguments and has shown no prejudice arising from it.
The record does not show that Oliveaux asked the court for additional time to argue, objected to the allocation of time for argument, or lacked a reasonable opportunity to object. La. C.C.P. art. 1635. Without a timely objection to the court’s trial procedure, the issue is not properly preserved for appeal. Holmes v. Peoples State Bank, 35,072 (La.App. 2 Cir. 9/26/01), 796 So.2d 176, writ denied, 2001-3139 (La.2/1/02), 808 So.2d 342, cert. denied, 537 U.S. 897, 123 S.Ct. 197, 154 L.Ed.2d 167 (2002).
Moreover, our review of this alleged error would be limited to whether the district court abused its great discretion in controlling the proceedings at trial. La. C.C.P. arts. 1631, 1632; Temple v. Liberty Mutual Ins. Co., 330 So.2d 891 (La.1976). In Mercer v. Fruehauf Corp., 492 So.2d 538 (La.App. 3 Cir.), writ denied, 496 So.2d 350 (1986), the district court allowed the plaintiffs counsel in a products liability case 30 minutes for closing argument and 15 minutes for rebuttal, while the manufae-turer’s 12ocounsel received only 30 minutes total. The court of appeal disapproved the unequal argument time but could find no prejudice or abuse of discretion. Likewise, we would perceive no abuse of the district court’s discretion in the instant case. This assignment lacks merit.

Admission of Investigator’s Report

By his fifth assignment, Oliveaux urges the district court erred in “excluding the investigator’s report and in prohibiting plaintiffs counsel from disclosing to the jury that evidence material to plaintiffs case was mislaid after being placed under the control of a team of attorneys which included Dr. Perkins’s husband.” He contends that the contents of the file are not hearsay and thus admissible. In support he cites Williams v. Augustus, 506 So.2d 630 (La.App. 4 Cir.), writ denied, 508 So.2d 66 (1987).
The “investigator’s report” was actually a letter from an Indigent Defender Board (“IDB”) investigator, offered to support the testimony of a witness, Debra Craig-head. Ms. Craighead, who had babysat Haley for a few weeks in late October and early November 1993, testified that Ms. Pace did not interview her, but if she had, Ms. Craighead would have told her she noticed evidence of child abuse, took a photo of Haley’s bloody diaper, and tried to report the situation to CPS, but the intake agent who answered the phone was “unresponsive.” She could not produce the photo at trial; after Haley’s death, she *1278 gave it to an IDB investigator named Cummings. Cummings wrote a letter to Duncan’s IDB attorney, Louis Scott,[6] advising | ¡¡.,that Ms. Craighead’s testimony would not be helpful to Duncan’s defense. Cummings later died, and a portion of this letter was found among his effects.
Oliveaux offered this “report” in an effort to corroborate Ms. Craighead’s trial testimony, and prove her assertion that CPS failed to process her initial report and that Ms. Pace failed to interview her in late November.[7] The district court excluded it because Cummings’s widow could not prove that it was a business record.
The hearsay exception for business records is La. C.E. art. 803(6):
Art. 803. Hearsay exceptions; availability of declarant immaterial.
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
* * *
(6) Records of regularly conducted business activity. A memorandum, report, record, or data compilation, in any form, * * * made at or near the time by, or from information transmitted by, a person with knowledge, if made and kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make and keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. This exception is inapplicable unless the recorded information was furnished to the business either by a person who was routinely acting for the business in reporting the information or in circumstances under which the statement would not be | ^excluded by the hearsay rule. * * *
The admissibility of the deceased investigator’s letter obviously hinges upon the “testimony of the custodian or other qualified witness” that the letter was part of his regularly conducted business activity. In Williams v. Augustus, supra, the court found that an attorney’s ledger book was admissible as a business record; even though the attorney who kept the ledger was deceased, his son, who had worked in the office, had knowledge of his father’s routine business practice and verified it, thus imparting reliability to the ledger.
No such foundation was made in the instant case. The investigator’s widow was not shown to be part of the business or a custodian of his records. Without that foundation, the letter is inadmissible, as were the letters in State in Interest of JW, 2000-1445 (La.App. 4 Cir. 1/10/01), 779 So.2d 961, and the invoices in Cole Oil & Tire Co. v. Davis, 567 So.2d 122 (La.App. 2 Cir.1990). This assignment lacks merit.

*1279
Conclusion

For the reasons expressed, the judgment is affirmed. The plaintiff, Jennifer 0. Berry, is to bear all costs.
AFFIRMED.
LOLLEY, J., dissents with written reasons.

. The Program Policy Manual, Chap. IV, Part V, 4-520 (November 1986) provided: “Level !• — The worker shall interview at least two (2) *1272 collaterals, one of whom shall be a medical professional. The contact with the medical professional includes a current physical examination of the alleged child victim, i.e. after the injury or alleged incident occurred, if required by manual policy 4-515 or indicated by case circumstance. It also includes a report by the medical professional documenting the existence of any abuse and/or neglect. After securing the medical professional collateral contact, the worker and the first-line supervisor shall confer regarding the need for a second professional collateral. If the supervisor determines that there is reason to believe that abuse has occurred and that a second professional collateral is needed to augment or corroborate existing evidence, a second professional collateral contact shall be secured. Additional collateral contact with other professional(s) with knowledge about the child and/or the family prior to the abuse and/or neglect incident may be made. The Child Protection Investigation Worker should conduct a thorough search of agencies that may have had contact with the child victim or his parent. Any additional collateral contacts which result from this search shall be documented in the case record and on the Intake (CPI-1) Form.”

. The charge provided: "Gross negligence is the absence of even slight care and diligence, and the absence of that diligence which even careless men are accustomed to exercise, such as to raise the belief that the conduct was the result of a conscious indifference to the safety of the person or persons to be affected by the conduct.
"Proof of gross negligence requires a showing of conduct which is beyond ordinary negligence or carelessness, and consists of utter disregard of ordinary prudence, amounting to a complete neglect of the rights of others.”

. The first paragraph of the jury form provided: "Do you find by a preponderance of the evidence that any employee of the Louisiana Child Protective Services was grossly negligent and that such gross negligence was a legal cause of injury to Haley Oliveaux? Yes _No_"

. Proposed jury charge No. 4 provided: "If you find that more than one person was at fault in causing the death of Haley Oliveaux, then you are to apportion the total fault among the tortfeasors. In apportioning fault you should consider all the relevant factors shown by the evidence. In comparing the fault of a negligent tortfeasor and an intentional tortfeasor, one factor you may consider is whether the negligent tortfeasor had a duty to protect the injured person from wrongful actions by the intentional tortfeasor.”

. As noted earlier, Oliveaux has not alleged the verdict was plainly wrong so we have not addressed the issue of manifest error. However, there was a wealth of testimony from which the jury may have concluded that Dr. Perkins met the standard of care for pediatricians and that CPS agents were not grossly negligent in their investigation.

. According to the record, Louis Scott is married to Dr. Perkins.

. Again, Oliveaux has not urged manifest error but we note the following. Ms. Craighead was not certain when she placed these calls, but felt it was before November 29. She testified that the person who answered did not ask for Haley's mother's name; however, both Ms. Foster and Ms. Pace testified that CPS intake workers are required to get this information as cases are filed by mother's name. Ms. Craighead runs a daycare out of her home and is not licensed; she admitted she had never called CPS until this incident with Haley. She told Cummings that she had called “Social Services or the Welfare Office, ” thus making it unclear whether she ever attempted to call CPS. Even if she did, the jury might well have speculated why Allison would have told Ms. Pace to contact Ms. Craighead.