STEWART, J.
hThe plaintiffs, Dronzy and Charles Lin-near, sued for damages after Mrs. Linnear fell in her yard in an area where the defendant, CenterPoint Energy Arkla (“CenterPoint”), had recently placed a new gas line. The Linnears alleged that Cen-terPoint’s failure to restore the property to its pre-repair condition caused the accident. A jury found no fault on the part of CenterPoint, and the trial court denied motions for a new trial and a judgment notwithstanding the verdict (“JNOV”). The Linnears appealed. Finding legal error in the trial court’s failure to include an instruction on res ipsa loquitur in the charge to the jury and finding liability established by application of that doctrine, we reverse the trial court’s judgment, award damages, and render judgment in favor of appellants.
FACTS
On July 8, 2002, the Linnears noticed a gas leak at their home. CenterPoint dispatched a crew to investigate.[1] The crew located the leak, turned off the gas, and placed a temporary line to maintain service at the residence. CenterPoint’s crew returned to the Linnears’ home a couple of days later to install a new gas line measuring 80 to 90 feet in length and running from the meter in the back of the Lin-nears’ house to the street in the front of the house. The crew dug a trench measuring 4 inches wide and 18 inches deep for the new gas line. Part of the trench ran *6 parallel to the Linnears’ driveway, with about two or three feet of distance between it and |¡¡the trench. The Linnears used the area alongside their driveway as a path for walking to and from their vehicles.
After digging the trench and placing the line in it, the crew backfilled the trench with dirt. According to testimony, the crew added up to 4 inches of dirt at a time and packed it down by stepping on it. Once the trench was full, they used a 30-pound steel tamper to further pack the ground. A backhoe was also driven over some areas. The crew leader, Herbert Randy Burkins, tested the compaction of the dirt by inserting a screwdriver into the ground. Burkins also did a visual inspection of the area. The crew did not replace sod or asphalt in areas where the trench had been dug.
The accident at issue occurred on July 16, 2002. It had rained sometime that night or during the early morning hours prior to Mr. Linnear leaving for work at 6:30 a.rm Around mid-morning, Mrs. Lin-near prepared to run an errand to her church with her granddaughter. Mrs. Linnear walked to her vehicle to place some items in the backseat on the driver’s side. As she stepped back around the open rear door to return to her porch to get her granddaughter, Mrs. Linnear’s right foot sank into the ground, and she fell forward. She felt a sharp pain in her lower back. She used the door handle on her vehicle to pull herself up and was able to continue on her errand. She called Mr, Linnear to tell him about the accident. He returned home around noon to find Mrs. Linnear in pain. He photographed the area of the fall where Mrs. Linnear claimed that her right leg sunk into the ground up to her knee.
LMrs. Linnear sought treatment for her injury and was diagnosed as having a herniated disk. She underwent surgery in December 2003. However, the injury continues to cause her pain for which she remains in treatment.
The Linnears sued CenterPoint for damages alleging that the crew’s failure to restore their property to its pre-repair condition by properly backfilling the trench and replacing .sod caused Mrs. Lin-near’s accident. According to their trial testimony, the Linnears had lived at their residence for 23 years with no accidents occurring in their yard. They also testified that after Mrs. Linnear’s accident, CenterPoint sent the crew to restore their property by replacing the sod and asphalt and spreading dirt on the ground. No further accidents happened after the restoration of their property.
The record shows that the trial court did not include an instruction on res ipsa lo-quitur as requested by the Linnears. Their counsel objected and proffered the rejected instruction into the record. The jury rejected the Linnears’ claim for damages by a vote of 10 to 2, finding no liability on the part of CenterPoint.
The Linnears filed motions for a new trial and JNOV. They argued that the verdict was clearly contrary to the law and the evidence. They specifically contended that the jury disregarded their undisputed evidence and improperly credited the testimony of the crew members, whose testimony contained inconsistencies and should have been considered unreliable. The trial court denied both motions. In its oral reasons, the trial court found that the photographic evidence belied Mrs. Linnear’s claim that | ¿she stepped into a sinkhole up to her knee. The trial court found that the photograph depicted only a footprint in a muddy area and that the evidence showed only that Mrs. Linnear slipped in the mud on a rainy day. The trial court concluded *7 there was no proof of how CenterPoint was responsible for the accident.
DISCUSSION
In this appeal, the Linnears argue that the jury was manifestly erroneous in finding no fault on the part of CenterPoint and that the trial court erred in not granting either the JNOY or a new trial. However, our review of the record convinces us that legal error impeded the fact-finding process as will be explained.
The manifest error standard applicable on appellate review provides that a jury’s verdict cannot be reversed unless the court, after reviewing the record in its entirety, finds there to be no reasonable factual basis for the jury’s findings and determines them to be manifestly erroneous or clearly wrong. Stobart v. State Through DOTD, 617 So.2d 880 (La.1993). However, where legal error interdicts the fact-finding process, the manifest error standard no longer applies. Ferrell v. Fireman’s Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742. In such instances, if the record is complete, the appellate court is charged to make its own independent de novo review of the record. Id.
Although the Linnears did not assign as error the failure of the trial court to instruct the jury on res ipsa loquitur, this court is charged to render any judgment which is just, legal, and proper upon the record on appeal. La. C.C.P. art. 2164. The article empowers us to do justice on the record regardless of whether a particular legal point or theory was made, argued, or passed upon by the lower court. Rachal v. Rachal, 35,074 (La.App. 2d Cir.10/12/01), 795 So.2d 1286.
The Linnears’ counsel had requested inclusion of the following jury instruction by the trial court:
Res ipsa loquitur is a rule of circumstantial evidence which allows a court to infer negligence on the part of the defendant if the facts indicate the defendant’s negligence, more probably than not caused the injury. Spott v. Otis Elevator Co., 601 So.2d 1355 (La.1992).
The trial court did not include the instruction. Counsel objected and tendered the instruction as a proffer in the record, thereby preserving the issue for review.
Adequate jury instructions are those which fairly and reasonably address the issues and provide correct principles of law for the jury to apply to the issues. Smart v. Kansas City Southern R.R., 36,-404 (La.App. 2d Cir,11/6/02), 830 So.2d 581; Kennedy v. Thomas, 34,530 (La.App. 2d Cir.4/4/01), 784 So.2d 692. The trial court is not required to give the precise instruction submitted by a party. The court need only give instructions that properly reflect the applicable law and adequately convey the issues. Smart, supra; Kennedy, supra., The . sufficiency of the jury charge is determined by reading all the charges together as a whole. Luman v. Highlands Ins. Co., 25,445 (La.App. 2d Cir.2/23/94), 632 So.2d 910. Instructions that are misleading or confusing, as well as those that omit an essential legal IfiPrincipIe, do not adequately set forth the law and may constitute reversible error. Smart, supra; Kennedy, supra.
Before overturning a jury verdict on the basis of an erroneous jury instruction, the appellate court must determine whether the jury was misled to such an extent as to have been prevented from doing justice. Smart, supra. The reviewing court must consider the gravity or degree of the error, the instructions as a whole, and the circumstances of the case in determining that a de novo review is warranted. Kennedy, supra. Appellate courts exercise great restraint in overturn *8 ing a jury verdict on the basis of an erroneous instruction. Id. We may not ignore the manifest error standard unless the instructions were so incorrect or inadequate as to have precluded the jury from reaching a verdict based on the law and the facts. Id.
In its instructions to the jury, the trial court explained that the plaintiffs have the burden of proving their case by a preponderance of the evidence and instructed the jury to deliberate without being swayed by sympathy, prejudice, or passion. The trial court' referred to La. C.C. arts 2315 and 23Í6 and defined negligence as “conduct which falls below the standard established by law for the protection of others and one’s self against an unreasonable risk of harm.” The court explained that liability is based on fault as determined from the facts and circumstances of the case. The court then went on to address the law applicable to proving damages. Notably, the court did not address or explain the differences between direct and circumstantial evidence.
|7In a negligelice action, the plaintiff typically meets his burden of proving his case by a preponderance of the evidence when the direct and circumstantial evidence, taken together, establishes the fact to be proved is more probable than not. Wood v. Spillers, 37,087 (La.App. 2d Cir.4/9/03), 843 So.2d 555, writ denied, 2003-1473 (La.9/26/03), 854 So.2d 366. A fact established by direct evidence is one which has been testified to by witnesses as having come under the cognizance of their senses. Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654 (La.1989). Circumstantial evidence is evidence of one fact or a set .of facts from which evidence of the fact to be determined may reasonably be inferred. Cangelosi supra.
The doctrine of res ipsa loqui-tur applies in cases where the plaintiff uses circumstantial evidence alone to prove negligence by the defendant. Can-gelosi supra. The doctrine, meaning “the thing speaks for itself,” permits the inference of negligence on the part of the defendant from the circumstances surrounding the injury. Id. As explained in Cangelosi supra, the doctrine applies when three criteria are met. First, the injury is the kind which ordinarily does not occur in the absence of negligence. While the plaintiff does not have to eliminate all other possible causes, he must present evidence indicating at least a probability that the accident would not have occurred absent negligence. Second, the evidence must sufficiently eliminate other more probable causes of the injury, such as the conduct of the plaintiff or a third person. The circumstances must warrant an inference of negligence. Third, the negligence of the defendant must fall ^within the scope of his duty to the plaintiff. This may, but not necessarily, be proved in instances where the defendant had exclusive control of the thing that caused the injury.
In deciding whether to instruct the jury on res ipsa loquitur, the trial court employs a standard similar to that for directed verdicts. Id. The trial court determines whether the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable persons could not arrive at a contrary verdict. If reasonable minds could reach different conclusions as to whether the defendant’s negligence caused the plaintiffs injury, then the trial court must instruct the jury on res ipsa loquitur. Cangelosi, supra; Smith v. Bundnck, 27,552 (La.App. 2d Cir.11/3/95), 663 So.2d 554. The jury then decides whether to infer *9 negligence on the part of the defendant from the circumstances of the case.
From our review of the record, we find that the trial court erred in not instructing the jury on res ipsa loquitur at the close of the case. The trial testimony included Mrs. Linnear’s account of how the accident happened, her assertion that she fell in a sinkhole, and testimony that no such accidents had ever happened in their yard before CenterPoint dug the trench and that none have happened since Cen-terPoint returned to restore the property to its pre-repair condition. The trial testimony also included the description of how CenterPoint’s crew refilled the trench, compacted the soil, and left the yard in good condition. The testimony was such that reasonable minds could reach different conclusions as to whether Center-Point’s negligence caused Mrs. Linnear’s injury. The trial court recognized as much in denying | nCenterPoint’s motion for involuntary dismissal at the close of the plaintiffs’ case after all witnesses had testified, except for Salter, who was called back on direct for CenterPoint. Moreover, we find that the failure to instruct the jury on res ipsa loquitur precluded the jury from rendering a verdict based on the law and the facts. This case turned on circumstantial evidence, but the jury was not even instructed on that aspect of the law. The jury should have been given instruction on circumstantial evidence and res ipsa loqui-tur to be allowed to evaluate the evidence and determine whether the circumstances warranted the inference that the defendant’s negligence caused the plaintiffs injury. Thus, we find that the res ipsa loquitur instruction should have been included by the trial court. Having recognized the error of law, we are charged to conduct a de novo review of this complete record and render judgment.

De Novo Review

To determine whether liability exists under the particular facts of a cáse, we employ the duty-risk analysis. The plaintiff must prove that the defendant owed a duty of care to the plaintiff, that the defendant breached the duty, that the defendant’s conduct was a cause-in-fact of the harm to the plaintiff, and that the risk of harm was within the scope of protection afforded by the duty breached by the defendant. Duncan v. Kansas City Southern Railway Co., 00-0066 (La.10/30/00), 773 So.2d 670, cert. dismissed, 532 U.S. 992, 121 S.Ct. 1651, 149 L.Ed.2d 508 (2001). All inquiries must be affirmatively answered for the plaintiff to establish | innegligence and recover damages. Id. The record shows that the plaintiffs met their burden of proving negligence and damages.
The trial testimony included Mrs. Lin-near’s account of how the accident occurred. She recalled that the trenched area was just dirt after CenterPoint completed its work, but she thought it looked safe to walk in the area. She testified that when she stepped back from her vehicle to walk around the open door, she stepped in the area of the trench and sank straight down into the ground in a “sinkhole” up to her knee. She fell forward, injuring her lower back and dirtying her clothing. Through her testimony, she conveyed that though it had rained in the early morning when her husband left for work, the ground was wet but not really muddy.
Mr. Linnear testified that there had been grass in the area where CenterPoint dug the trench alongside the driveway and that they used the area as a walk path to and from their vehicles. On the morning of the accident, there were “signs of rain” when he left for work, and he recalled that it had rained during the night. He learned of his wife’s accident when she *10 called him during mid-morning. He returned home around lunchtime and brought a camera to photograph the area where she fell. Both he and his wife testified that it rained more after the accident. Mr. Linnear testified that he had not noticed any holes in the ground prior to the accident. The area had appeared stable with the ground being neither loose nor soft. He testified that he had likely walked in the area on his way to his vehicle that morning. He denied that the area where Mrs. Linnear fell had been muddy, Ineven though he admitted that her shoes were muddy when he saw her later that day.
Herbert Burkins and Thomas Salter worked on the CenterPoint crew and testified at trial about the work done at the Linnears’ residence. There were some differences in their testimony as to whether they worked in the morning or afternoon, whether the gas meter was moved, and whether the trench was to the left or right of a flower bed. They also differed as to the number and location of the gas leaks found. However, these issues are not pertinent to a determination of whether any negligence occurred.
Burkins and Salter gave similar testimony as to the method used to fill and compact the trench. Burkins, the crew leader, testified that the new gas line was placed about 4 inches ■ from the old one. The trench, which was 18 inches deep, was back-filled by adding up to 4 inches of dirt at a time and using body weight to walk down each addition until the trench was filled. The crew then took turns using a 30-pound steel tamper to tamp down and harden the ground. He also recalled running a backhoe over some areas to further harden the ground. Burkins did a visual check of the area and inserted a screwdriver into the ground to check the compaction. He testified that they did not add extra dirt or replace sod.
Salter gave similar testimony to that of Burkins as to the method used to refill and compact the trench. He recalled that most of the area trenched had grass, except for the area alongside the driveway. He testified that the trench was sturdy and uniform. He noticed no signs of sinkholes. Salter said they put 2 to 3 inches of dirt at a time in the trench and walked it down, | ^repeating until the trench was full. They used the steel tamper to tamp both crosswise and lengthwise, and they ran machinery over some areas to further harden the ground. Even though they did not replace any sod, he thought the yard was in good condition when they completed the job. Salter testified that he saw no holes and that there was no need for additional dirt in the yard. Salter also testified that he had worked hundreds of such jobs and that all were done the same way. Salter returned for the post-accident “dress-up” of the Linnears’ property. He stated that they only distributed about half of a wheelbarrow of dirt throughout the area and placed sod as requested. He did not recall filling any holes or footprints in the ground. He stated that dirt was raked in the area of the accident to make it even with the driveway.
Photographs taken by Mr. Linnear after the accident were introduced into evidence. The photographs depict a sunken footprint in the ground. While the photographs show what is clearly more than a mere surface impression, they do not depict the exact depth to which Mrs. Linnear’s foot sank in the ground. A waterhose is shown in some of the photographs, but there was no testimony as to when or if it had been used prior to the accident.
The accident occurred on July 16, 2002, only days from when CenterPoint dug an 18-inch deep trench in the Linnears’ yard *11 for a new gas line. CenterPoint crew members, Burkins and Salter, testified as to how they refilled the trench, compacted the soil, and believed the yard to be in good shape. However, the Linnears testified that no such accidents had ever |13occurred in their yard before the work, and they testified that no more occurred after CenterPoint returned post-accident to add dirt and sod to the trenched area. While the fact that an accident occurred does not alone give rise to a presumption of the defendant’s negligence, the coincidence of Mrs. Linnear’s foot sinking in the very area that had been dug and refilled by CenterPoint just days before cannot be ignored. Even though there was some evidence of rainfall prior to the accident, both Linnears testified that the rain had fallen in the early morning hours. The accident happened sometime around mid-morning, some hours after the Linnears claimed it had rained. The Linnears also both testified that it had rained more after the accident, and this accounts for the muddy appearance of the area in the photographs taken after Mr. Linnear returned from work at lunchtime. The Linnears’ testimony was uncontradicted.
While no evidence directly establishes that CenterPoint’s crew was negligent, the facts and circumstances of this case are such that negligence of the defendant may readily be inferred under the doctrine of res ipsa loquitur. Mrs. Linnear seriously injured her lower back when her foot sank into the ground in an area of her yard where a trench had recently been dug and refilled by CenterPoint. There were no holes in the ground prior to the accident, and one’s foot does not normally sink deeply into the ground even at times of rainfall. The fact that the Linnears had used the area where the accident occurred as a walkpath over the years without accident suggests that this particular incident cannot be attributed to a mere slip and fall in the mud as suggested by the trial court in denying the motions for JNOV and |14new trial. There was no evidence that Mrs. Linnear did anything to cause herself to fall, nor was there any other likely cause as the evidence was that it was not raining at the time of the accident and had not rained since the early morning. Finally, CenterPoint had a duty to refill the trench and compact the ground so as to harden the area for protection of the new gas line and for the safe use of the area by the homeowners. The duty would require CenterPoint to insure that the refilled trench would remain solid and compacted in the normal event of rainfall. Under the circumstances of this case, it is obvious that CenterPoint breached its duty and that the breach caused injury to Mrs. Lin-near when she stepped back and sank down into the area that had been refilled by CenterPoint.
Because the evidence in this case is sufficient to conclude more probably than not that CenterPoint was negligent and caused Mrs. Linnear’s injury, we must reverse the jury verdict and render judgment in favor of the Linnears. Having a complete record before us for review, we will now assess damages.

Damages

The Linnears seek both general and special damages resulting from the injury to Mrs. Linnear caused by Center-Point’s negligence. General damages are those which cannot be fixed with pecuniary exactitude. Duncan v. Kansas City Southern Raihuay Co., supra. Special damages are those which have a ready market value and can be determined with relative certainty, such as medical expenses. Moody v. Blanchard Place Apartments, 34,587 (La.App. 2d Cir.6/20/01), 793 So.2d 281, writ denied, 01-2582 (La.12/14/01), 804 So.2d 647. In making *12 an initial award of damages, we set the award in an amount determined to be just compensation for the damages shown by the record. Maranto v. Goodyear Tire & Rubber Co., 25,114 (La.App. 2d Cir.5/10/95), 661 So.2d 503.
Mrs. Linnear seeks general damages for past and future pain and suffering, loss of enjoyment of life, and mental anguish. She also seeks damages for loss of earning capacity and for past and future medical expenses. Additionally, Mr. Linnear seeks loss of consortium damages, with a specific claim for loss of household services.
Mrs. Linnear testified that she felt a sharp pain in her back when her leg went down into the ground. She called her general care physician, Dr. May, that day but was not able to get an appointment until the following Tuesday. Despite conservative treatment, Mrs. Linnear continued to have worsening back pain. Dr. May ordered an MRI and referred her to Dr. Marcos Ramos, a neurosurgeon, in September 2002. She was diagnosed with a herniated disc at the right L5-S1. Dr. Ramos believed that it was caused by the accident as described by Mrs. Linnear. He informed her that she had two options — either live in pain or undergo surgery. Mrs. Linnear did opt for surgery, which took place on December 5, 2003. In the interim, Mrs. Linnear contended with cervical cancer and other health problems unrelated to the accident. Dr. Ramos performed a total lumbar laminectomy and a microdiscectomy to remove the damaged disc which had been pinching a nerve.
11fiFollowing surgery, Mrs. Linnear had some improvement, but by February 2004, she began to have some regression. Over the months, she continued to have pain in her lower back and hip radiating down her right leg. Dr. Ramos treated her with medications, such as Bextra for a limited time due to a pre-existing heart condition and Motrin. He finally referred her to a pain management specialist to address the chronic pain. An MRI reviewed by Dr. Ramos in May 2005, showed a bulging disc at L5-S1, which Dr. Ramos described as scar tissue resulting from routine postoperative changes. Dr. Ramos explained that the bulging disc was likely contributing to Mrs. Linnear’s pain, but he did not recommend any treatment.
At trial, Dr. Ramos testified that Mrs. Linnear had reached maximum medical improvement, but he noted that other health conditions also prevent her from being more active than she is. He testified that she would likely need to be seen every ten to twelve weeks for life. The charge for an office visit was stated to be $80. The record shows total charges for Dr. Ramos’ past medical services to be $7,447.
In December 2004, Mrs. Linnear began treatment with Dr. Sudar Tanga, an anesthesiologist specializing in pain management. According to Dr. Tanga, Mrs. Lin-near was experiencing persistent lower back pain. Over the course of his treatment, he tried various long-acting pain medications, including Methadone, Oxy-Contin, MSContin, Kadian, and a Duragesic patch. Mrs. Linnear was unable to tolerate any of the drugs due to side effects. Dr. Tanga also recommended weight loss as the most important 117means of helping lower back pain and becoming more active. Dr. Tanga finally recommended an intrathecal trial to determine the proper medication for internal administration through an implanted pump. He explained that the pump administers small drops of medication every twenty-four hours with the benefits of reducing the adverse side effects of the medication by three hundred percent and being less expensive over time than taking oral medications. His past successes using the *13 pump with patients led him to believe that he could find a medication appropriate for Mrs. Linnear. However, Mrs. Linnear was not in favor of having a pump implanted and having no control over the medication being administered. She consulted with Dr. Ramos, who suggested that she get a second opinion and referred her to another pain management specialist. An appointment was pending at the time of trial. The record established the charges for Dr. Tanga’s services to be $3,310.
Mrs. Linnear, who was 51 at the time of the accident, testified that she was in good health prior to the accident. She was exercising at a gym three times a week. She was an active homemaker who had not worked outside the home since 1993, when she quit her job as a nurse’s aide. She was also active in her church, where she guided two praise dance groups of children and teenagers. She enjoyed visiting friends and family, traveling with her husband, and taking care of her grandchildren. She and her husband shared a close relationship with frequent physical intimacy, but she reports that she can no longer satisfy all his needs. With the onset of chronic pain, she is no longer able to do the housework, work with her |1schurch dance groups, travel, or socialize as she used to with family and friends. She cannot sit for long periods of time. She admitted that some days are good, but her condition changes day to day. The chronic pain has caused her stress and periods of depression.
There is no mechanical rule for ' determining general damages; rather, the facts and circumstances of each case must be considered. Maranto v. Goodyear Tire & Rubber Co., supra. Severity and duration are factors to be considered in determining an award for pain and suffering. Id. An award for loss of enjoyment of life requires showing that the plaintiffs lifestyle was detrimentally altered or that the plaintiff had to give up activities because of the injury. Day v. Ouachita Parish School Board, 35,831 (La.App. 2d Cir.8/18/02), 823 So.2d 1039, writ denied, 02-2532 (La.12/19/02), 833 So.2d 343.
The record establishes that Mrs. Linnear has suffered back pain since the accident occurred and that she has continued to suffer pain even after having surgery. The pain will have to be managed over her lifetime with medication to ease her discomfort. An orthopaedic surgeon, Dr. Robert Holladay, has assessed Mrs. Linnear with a twelve percent whole body impairment. The chronic pain has adversely impacted her life by affecting her ability to take care of her home. She can no longer socialize with family and friends or actively participate in her church activities as she did before the accident. The injury has also caused the loss of some physical intimacy with her husband. Medical evidence shows that Mrs. Linnear suffers from other health ailments, particularly related to her heart, that may impact her 119activity level. These are not related to the accident. Considering all of the facts of this case relative to Mrs. Linnear’s claim for general damages for pain and suffering, mental anguish, and loss of enjoyment of life, we award total damages of $150,000.
The record establishes that Mrs. Linnear incurred the following medical expenses related to the treatment of her lower back injury, including the surgery performed by Dr. Ramos:
Dr. Marcos Ramos $ 7,447
Willis Knighton Medical Center $15,975.74
Shreveport Anesthesia Services $ 1,300
Dr. Sudar Tanga $ 3,310
Thus, we award $28,032.74 in past medical expenses.
While the cost or extent of future medical treatment cannot be precisely
*14 measured, the plaintiff must still establish future medical expenses with some degree of certainty through medical testimony that such expenses are indicated and their probable cost. Sepulvado v. Turner, 37,-912 (La.App. 2d Cir.12/10/03), 862 So.2d 457. The record establishes that Mrs. Linnear will incur future medical expenses for treatment of her back injury and chronic pain. Dr. Ramos testified that she will likely be followed by his office on a basis of ten to twelve times a year at a cost of $80 per visit. Dr. Melvin Harju, accepted by the court as an expert economist, determined the present value of such treatment for Mrs. Linnear’s expected life span to be $9,481. A prescription profile introduced into evidence shows that Dr. Ramos prescribes Motrin and Skelaxin for Mrs. Linnear. Dr. Harju calculated the present value of these medications over Mrs. Linnear’s lifetime to be $4,496 and $5,930 respectively. However, while the record, | ¡^particularly the testimony of Dr. Ramos, indicates that Mrs. Linnear will likely need pain medications for life, it does not establish what those medications will be. At the time of trial, Mrs. Linnear was planning to consult with another pain management specialist, and the option of the pain pump was still available. Keeping in mind that an award of future medical expenses cannot be made with exactness, we believe that the record supports an award of $20,000 to compensate Mrs. Linnear for the future costs of treatment related to her back injury and chronic pain.
Much testimony was presented in an effort to prove entitlement to damages for loss of earning capacity. However, we find that the record does not support such an award. At the time of the accident, Mrs. Linnear was a homemaker. She voluntarily left the workforce in 1993. She explained that she was unhappy with her job and that her husband told her she could stay home since their children were grown. At trial, she expressed no real interest in returning to work. She made vague references to selling Mary Kay cosmetics or making candy with a friend as possible jobs of interest. Nothing in the record establishes that Mrs. Linnear’s limitations from her injury would prevent her from pursuing either activity should she decide to do so. For these reasons, we reject Mrs. Linnear’s claim for damages for loss of earning capacity.
Lastly, we turn to the claim for loss of consortium by Mr. Linnear. Damages for loss of consortium are based on loss of love and affection, loss of society and companionship, impairment of sexual relations, loss of performance of material services, loss of financial support, loss of aid and [31 assistance, and loss of fidelity. Brandao v. Wal-Mart Stores, Inc., 35,368 (La.App. 2d Cir.12/19/01), 803 So.2d 1039, writ denied, 02-0493 (La.4/26/02), 814 So.2d 558; Maranto, supra. Considering these factors, the record does not show a loss of financial support as Mrs. Linnear was not working at the time of the accident nor in the years prior to it. The record does show the Linnears to have a close and loving relationship that has withstood the challenges of Mrs. Linnear’s injury and chronic pain. However, both spouses testified that their sexual relationship has been greatly curtailed by Mrs. Linnear’s injury. Both also testified that Mrs. Linnear is no longer as active. The chronic pain prevents her from socializing and traveling as before the accident and impacts the society and companionship shared with her husband. She can no longer perform household chores. Instead, Mr. Linnear spends four to five hours each week on household work that his wife cannot do. Mr. Linnear testified that it is emotionally taxing to see his wife *15 in pain all of the time. The record also shows that Mr. Linnear was his wife’s primary caretaker after her surgery. He took a leave of absence from work of twenty days to care for his wife in her recovery.
We note that Mr. Linnear’s claim for loss of consortium also included a specific request for loss of household services. Our law allows recovery of reasonable housekeeping expenses necessitated by the incapacity of an injured spouse. Brandao, stipra; Maranto, supra. An award for loss of household services was found appropriate in Maranto, supra, where Mrs. Maranto’s injury prevented her from providing household services, so her 122children and husband performed the household and yard work. The trial court’s award was reduced on appeal, because Mrs. Maranto was able to do some of the work. In this matter, the record establishes that Mr. Linnear performs four to five hours of household work a week that Mrs. Linnear can no longer do. Dr. Harju, the economist, made a number of calculations based on an hourly wage of $6.52 for maid or housekeeping services. However, an award for such services must take into account that Mrs. Linnear’s ability to function may vary from day to day and that health factors other than her back injury may play a future part in how much assistance is needed with household chores.
We find that Mrs. Linnear’s injury has adversely impacted both the spousal relationship and their marital lifestyle. Moreover, it has burdened Mr. Linnear with household chores previously seen to by his wife. The duration of these adverse consequences appears indefinite due to the chronic nature of Mrs. Linnear’s injury and pain. Considering all the factors mentioned above, we award total damages of $75,000 for loss of consortium and loss of household services in this matter.
CONCLUSION
In accordance with the aforementioned reasons, we hereby reverse the trial court’s judgment, render judgment in favor of the plaintiffs, and award damages as follows:
General Damages $150,000
Past Medical Expenses $ 28,032.74
Future Medical Expenses- $ 20,000
Loss of Consortium/Household $ 75,000
Costs of this appeal are assessed against the defendant.
REVERSED AND RENDERED.

. The Linnears incorrectly named the defendant as CenterPoint Energy Entex/Reliant Energy. The correct name is CenterPoint Energy Arkla, a division of CenterPoint Energy Resources Corp. The defendant is referred to as CenterPoint in this opinion.